In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00074-CV
______________________________


DEBRA L. CHANDLER, Appellant
 
V.
 
BALBIR SINGH, M.D., JOHN LEWIS, R.PH., AND 
WAL-MART STORES, INC., Appellees


                                              

On Appeal from the 202nd Judicial District Court
Bowie County, Texas
Trial Court No. 01C1123-202


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Chief Justice Morriss


O P I N I O N

            Debra L. Chandler sued her physician, Balbir Singh, M.D., her pharmacist, John Lewis,
R.Ph., and Lewis' employer, Wal-Mart Stores, Inc., alleging she was injured in an automobile
accident caused by a seizure brought on by a medication prescribed for her by Singh and provided
by Wal-Mart and Lewis. Chandler's lawsuit was dismissed by the trial court under Tex. Rev. Civ.
Stat. Ann. art. 4590i, § 13.01(e)


 due to asserted deficiencies in her required expert reports. 
Chandler appeals the dismissal. We reverse.
            A timely expert report may be challenged by motion to dismiss. See Tex. Rev. Civ. Stat.
Ann. art. 4590i, § 13.01(l) (repealed 2003). The trial court shall grant the motion only if it appears
to the court, after hearing, that the report does not represent a good-faith effort to comply with the
statutory definition of an expert report. See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l); Am.
Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 877–78 (Tex. 2001). In
determining whether the report represents a good-faith effort, the trial court's inquiry is limited to
the four corners of the report. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6) (repealed 2003);
Palacios, 46 S.W.3d at 878.
            Omission of any of the statutory elements prevents the report from being a good-faith effort. 
Palacios, 46 S.W.3d at 879. A report that merely states the expert's conclusions about the standard
of care, breach, and causation does not meet the statutory requirements. Id. These three separate
requirements must all be present and described with sufficient specificity.
            The expert report must set forth an applicable standard of care. Tex. Rev. Civ. Stat. Ann.
art. 4590i, § 13.01(r)(6). The standard of care for a physician is what an ordinarily prudent physician
would do under the same or similar circumstances. Palacios, 46 S.W.3d at 880. Identifying the
standard of care is critical: "[w]hether a defendant breached his . . . duty to a patient cannot be
determined absent specific information about what the defendant should have done differently." Id. 
"While a 'fair summary' is something less than a full statement of the applicable standard of care and
how it was breached, a fair summary must set out what care was expected, but not given." Id. In
other words, the report must specify what the defendant should have done.
            Second, the expert report must indicate how the defendant breached the standard of care. The
report must indicate what actions taken by the defendant deviated from the standard of care. It must
be a "fair summary" of the care which was expected, but not given. Id.
            The expert's report must also contain information on causation. It is not enough for a report
to contain conclusory insights about the plaintiff's claims. Bowie Mem'l Hosp. v. Wright, 79 S.W.3d
48, 52 (Tex. 2002); Moore v. Sutherland, 107 S.W.3d 786, 790 (Tex. App.—Texarkana 2003, pet.
denied). Rather, the expert must explain the bases of the statements and link his or her conclusions
to the facts. Wright, 79 S.W.3d at 52.
            The plaintiff must only make a good-faith attempt to provide a fair summary of the expert's
opinions in the expert report. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l); Palacios, 46 S.W.3d
at 875. A "good-faith" effort requires that the report discuss the standard of care, breach, and
causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called
into question and to provide a basis for the trial court to conclude that the claims have merit. 
Palacios, 46 S.W.3d at 875. "[T]o avoid dismissal, a plaintiff need not present evidence in the report
as if it were actually litigating the merits. The report can be informal in that the information in the
report need not meet the same requirements as the evidence offered in a summary-judgment
proceeding or at trial." Id. at 879. The expert report also need not prove the defendant's liability,
but rather only provide notice of what conduct forms the bases of the plaintiff's complaints. "To
constitute a 'good-faith effort,' the report must provide enough information to fulfill two purposes: 
(1) it must inform the defendant of the specific conduct the plaintiff has called into question, and
(2) it must provide a basis for the trial court to conclude that the claims have merit." Wright, 79
S.W.3d at 52 (citing Palacios, 46 S.W.3d at 879).
            Palacios makes it clear a claimant must address specific behavior in a medical report because
"knowing what specific conduct the plaintiff's experts have called into question is critical to both the
defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the
plaintiff's claims." Palacios, 46 S.W.3d at 877. The Texas Supreme Court stated that "[w]hether
a defendant breached his or her duty to a patient cannot be determined absent specific information
about what the defendant should have done differently." Id. at 880. In other words, one must be able
to determine from the report what action the standard of care required. This requires "specific
information about what the defendant should have done differently." Id. However, the report is not
required to use particular words. Wright, 79 S.W.3d at 53; Sutherland, 107 S.W.3d at 790. It is the
substance of the opinions, not the technical words used, that constitutes compliance with the statute. 
Sutherland, 107 S.W.3d at 790. 
            Dismissal under Article 4590i, § 13.01(e) is treated as a sanction and is reviewed for an abuse
of discretion. See Palacios, 46 S.W.3d at 877.
            Chandler presented two expert reports. One was dated January 10, 2002, from Diane B.
Ginsburg,  M.S.,  R.Ph.,  FASHP,  addressing  the  pharmacy's  services.  The  other  was  dated
January 14, 2002, from Lee A. Fischer, M.D., addressing the physician's services and causation from
the pharmacy's services.
I. Wal-Mart and Lewis
            Ginsburg's report, as supplemented


 by Fischer's report, furnishes expert opinions on the three
required elements relative to the pharmacist, Lewis, and his employer, Wal-Mart.
            A. Pharmacy Standard of Care.
            The standard of care expected from the pharmacy was set out with the following language:
 
It is my opinion that Walmart Pharmacy was operating below acceptable
pharmaceutical standards of care in filling the Ultram prescription for Debra
Chandler. According to the Texas Pharmacy Rules §291.33 (2) (a), "a pharmacist is
required to perform a drug regimen review to promote therapeutic appropriateness. 
The pharmacist shall at the time of dispensing a prescription drug order, review the
patient's medication record. Such review shall at a minimum identify clinically
significant:
. . .
(II) Rationale [sic] therapy-contraindications;
. . .
                        (VIII) Drug-disease interactions;
(IX) Adverse drug reactions . . . .
 
(b) Upon identifying any clinically significant conditions, situations, or items
listed in clause (a) . . ., the pharmacist shall take appropriate steps to avoid or resolve
the problem including consultation with the prescribing practitioner."
 
. . . Upon discovery of [prior] prescriptions [from the Walmart Pharmacy], the
pharmacist should have asked the patient if they were currently taking carbamazepine
for . . . a seizure disorder. . . . The literature clearly states that a person with a prior
history of seizure activity [such as Chandler] is at an increased risk of having a
seizure when taking Ultram. The pharmacist should not have filled the prescription
for Ultram and [should have] contacted Dr. Singh regarding the discovery of this
information.

            The Ginsburg report clearly sets out a standard of care for the pharmacy as stated by
administrative rule, although using the wrong version of the applicable rule. The version of 22 Tex.
Admin. Code § 291.33(c)(2) in effect in May 1999—the time of the prescription and accident—read
in pertinent part as follows:
 
 
§ 291.33. Operational Standards.
                                                                        . . . .
(c) Prescription dispensing and delivery.
                                                                        . . .
            (2) Pharmaceutical care services.
(A) Drug regimen review.
(i) For the purpose of promoting therapeutic appropriateness, a pharmacist shall at
the time of dispensing a prescription drug order, review the patient's medication
record. Such review shall at a minimum identify clinically significant:
. . .
(III) drug-disease contraindications;
. . . .
(ii) Upon identifying any clinically significant conditions, situations, or items listed
in clause (i) of this subparagraph, the pharmacist shall take appropriate steps to avoid
or resolve the problem including consultation with the prescribing practitioner.

19 Tex. Reg. 9179, 9180 (1994) (Texas State Board of Pharmacy). Though Ginsburg's report
misquotes the rule, it substantially states the correct standard of care applicable in this case. It states
essentially that Lewis should have reviewed Chandler's medication record, recognized Chandler's
increased risk of seizure if she took Ultram, and taken steps to avoid filling the Ultram prescription. 
That is sufficient to give the parties and the trial court notice of what Ginsburg believes should have
been done.
            B. Pharmacy Breach.
            Ginsburg summarized the pharmacy's breach of the standard of care with the following
language:
It is my opinion that Walmart Pharmacy was operating below acceptable
pharmaceutical standards of care in filling the Ultram prescription for Debra
Chandler. . . . Upon discovery of [Chandler's several previous prescriptions for
carbamazepine in her medication record], the pharmacist should have asked the
patient if they were currently taking carbamazepine for . . . a seizure disorder. . . . 
The pharmacist should not have filled the prescription for Ultram and [should have]
contacted Dr. Singh regarding the discovery of this information.

            Likewise, Ginsburg's report adequately states a breach—not reviewing Chandler's medication
record, not asking Chandler about her seizure disorder, and filling the prescription without contacting
Dr. Singh.
            C. Pharmacy Causation.
            Causation from the pharmacy's breach was touched on in the following Ginsburg language:
 
The literature clearly states that a person with a prior history is at increased risk of
having a seizure when taking Ultram.

Dr. Fischer's report adds the following language regarding causation, applicable to the pharmacy:
 
Taking Tegretol and Ultram lowered [Chandler's] threshold for seizures and she
suffered a seizure while driving 5/24/99 resulting in her motor vehicle accident and
subsequent injuries. Debra had been seizure-free for at least six years and stable on
her current medication. If a different medication had been prescribed instead of
Ultram more likely than not she would not have suffered the seizure and the resulting
accident. . . .
 
Five days [after receiving the prescription for Ultram] Chandler had a seizure while
driving and suffered multiple injuries in the motor vehicle accident. More likely than
not taking Ultram was a direct and proximate cause of the seizure and the motor
vehicle accident.
 
. . . It is my medical opinion that the deviation from pharmacy standards of care as
stated by Diane Ginsburg [in her report] was another cause of the damages suffered
by Debra Chandler.

            Though Ginsburg's report barely touches causation, the element does appear in her report,
and Fischer's report amply supplements Ginsburg's opinion with his causation opinion.
II. Singh
            Fischer's report states his opinions concerning the standard of care, the breach, and causation
relating to Dr. Singh.
            A. Physician Standard of Care.
            Fischer's report addresses standard of care with the following language:
The standard of care requires that physicians be aware of the risk of seizures when
prescribing Ultram, and the increased risk of seizure activity when using Ultram in
patients with known history of seizures.
With that language, Fischer gives Dr. Singh notice that he was expected to be aware of Chandler's
seizure risk and to consider it when prescribing other medication, Ultram, which increases that risk.
            B. Physician Breach.
            Dr. Fischer opines that Dr. Singh failed to meet the standard of care as follows:
It is clear that Dr. Singh did not consider the potential increased risk of seizures when
he prescribed the Ultram and that constituted a failure to comply with the standard
of care. Had Dr. Singh considered the potential adverse effect of Ultram in patients
with known seizure disorder, he would have prescribed a different analgesic
medication, many of which are available that would not potentiate the risk of
seizures.
 
By  failing  to  consider  the  heightened  risk  of  seizures  when  prescribing  Ultram,
Dr. Singh failed to comply with the standard of care. . . .
 
Despite knowing [Chandler's epilepsy] history, Dr. Singh prescribed Ultram which
has the potential to increase the risk of seizures especially in patients with a know
[sic] history of seizures. He failed to take her seizure history into account when he
prescribed Ultram.
This sets out failures by Dr. Singh in detail.
            C. Physician Causation.
            Fischer's report also addresses causation with this language:
Taking Tegretol and Ultram lowered [Chandler's] threshold for seizures and she
suffered a seizure while driving 5/24/99 resulting in her motor vehicle accident and
subsequent injuries. Debra had been seizure-free for at least six years and stable on
her current medication. If a different medication had been prescribed instead of
Ultram more likely than not she would not have suffered the seizure and the resulting
accident. . . .
 
Five days [after receiving the prescription for Ultram] Chandler had a seizure while
driving and suffered multiple injuries in the motor vehicle accident. More likely than
not taking Ultram was a direct and proximate cause of the seizure and the motor
vehicle accident.
            Fischer's report here provides Dr. Singh and the trial court with the specific information
required. From the opinion supplied, Dr. Singh knew precisely the complained-of failures. Further,
the trial court had information on which to evaluate the viability of Chandler's claims.
III. Conclusion
            The reports together constitute a good-faith attempt to give a fair summary of the standard
of care, the breach, and the cause of the injuries suffered as a result of that breach concerning the
three defendants. Because the reports in this case are not conclusory and do not require inferences,
the reports adequately fulfill the requirements of the statute. Therefore, the trial court had no
discretion to conclude that the reports did not constitute a good-faith effort.
 
            Accordingly, we reverse the judgment of the trial court and remand the case to the trial court
for further proceedings.
 
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          January 5, 2004
Date Decided:             February 13, 2004