IN THE

TENTH COURT OF
APPEALS




 
 
 
 
 
 
 


 



No. 10-00-00373-CV

 

Marie Langley, Individually

and as Representative of the 

Estate of John Langley and 

Mariah Langley, a Minor,

                                                                      Appellant

 v.

 

Floyd E. Jernigan, M.D.,

                                                                      Appellee

 

 



From the 19th District Court

McLennan County, Texas

Trial Court # 2000-2532-1

 



DISSENTING Opinion AFTER
REMAND



 

PRELUDE TO AN OPINION

 

How can you approach this appeal without taint, predisposition, or
prejudice?  Read Appendix A and B and
answer these questions:  What was
expected of Dr. Jernigan?  What did Dr.
Jernigan do, or not do, that violated that expectation?  How did that violation by Dr. Jernigan of the
expectation proximately cause injury to Langley?  Do not proceed until you have answered these
questions for yourself only from the original two expert reports.  If those three questions can be reliably and
consistently answered from the four corners of the two reports without
inference or argument, or references to other information or evidence, I am
wrong in writing this dissent.  But if we
give proper deference to the trial court in its determination that these
reports were inadequate, the proper disposition of this appeal must be that the
trial court did not err in its determination that the reports are inadequate,
even when taken together and implied by his rulings, if necessary, that it was
inadequate because the required elements of an expert report as to Jernigan
were not included.

The interpretation of article 4590i put forth by this Court in its
opinion, if accepted by other courts for the newly codified version thereof, would
be high on the top ten list of the most significant setbacks for the Medical
Liability and Insurance Improvement Act as compared to what the legislators
thought they passed.  According to what
the majority is holding, as long as the expert report contains some statement
that could possibly refer to each element of a medical negligence claim, the
report meets the requirements of an expert report.

This particular fact pattern presents the classic case to which the act
was designed to apply.  The plaintiff
sued everybody mentioned in the medical records.  But when it came time to file expert reports
to show the merits of the claim as to each defendant, the plaintiff could not
provide the information as to each defendant individually.  So what the plaintiff did was prepare expert
reports that muddied the waters as to who was responsible for what and threw in
some veiled references to standard of care, breach, and causation, but made no
effort to lay out each of these elements for each defendant.

The Court lets Langley drag Jernigan into this suit by two expert reports that may contain information
on all of the required elements for an expert report as to some of the
defendants, but does not contain all of the elements as to Jernigan.  This is intolerable.

The whole purpose of this part of the statute was to allow health care
providers, including doctors, the ability to escape from meritless litigation
as soon as possible.  What the Court does
today greatly frustrates the purpose of the statute.

THE CASE

This medical malpractice case is on remand from the Texas Supreme
Court.  Langley sued a hospital and a
group of doctors, including Jernigan, after the death of her husband,
John.  The trial court dismissed and severed
Langley’s claims against Jernigan under former article 4590i.

Langley brought this appeal.  A
majority of this Court previously held that Jernigan had waived the benefits of
article 4590i by waiting too long to assert his rights.  That decision was reversed and the case
remanded to us for further proceedings. Jernigan v. Langley, 111 S.W.3d
153, 158 (Tex. 2003).  We now consider Langley=s other issues noting
that the Supreme Court has issued two opinions that I believe control the
disposition of this appeal.  Walker v.
Gutierrez, 111 S.W.3d 56 (Tex. 2003); American
Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873 (Tex. 2001).  In an excellent opinion by Chief Justice
Morriss, I also note the Sixth Court
’s
application of Palacios to a situation
somewhat like this one which involved the use of multiple experts to satisfy
the requirements of article 4590i.  Chandler v. Singh, 129 S.W.3d 184, 187 (Tex. App.CTexarkana 2004, no pet.).  The
quality of the expert reports in Chandler, however, is what should control the difference between the results in
the two cases.

                                                  JOHN=S DEATH

Langley took John to the
emergency room because he was experiencing stomach pain.  He was treated and released.  They returned less than two hours later.  John was in acute pain.  He was admitted to the hospital.  His condition worsened.  Emergency surgery was performed.  A second operation was performed the next
day.  John died approximately forty-nine
hours after he first went to the emergency room.

                           THE
REPORTS, THE MOTION, THE HEARING

Approximately forty-five days after filing suit, Langley filed two expert
reports.  One expert report was by
doctors Charles McKhann, a surgeon, and Albert Weihl, an emergency-room and
family doctor.  See Appendix A.  The other expert
report was by Dr. Howard Spiro, a gastroenterologist.  See
Appendix B.  Excerpts and
characterization of the content of these reports are inadequate to reveal how
little they said about Jernigan’s participation in the process.  So to assist the reader in understanding the
issues, I have attached the text of the reports as Appendix “A” and  “B” respectively.  After the motion to dismiss was filed, but
prior to Langley’s claims being dismissed, Langley filed a supplemental
report by Dr. McKhann.  See Appendix D.

Jernigan=s motion to dismiss
asserted that the initial reports of Langley=s experts did not meet
the specificity requirements of former article 4590i.[1]  Langley=s response, in addition
to asserting the alleged untimeliness of Jernigan asserting his rights under
article 4590i, asserted that the reports were adequate and alternatively asked
the trial court to consider McKhann=s supplemental report.

The trial court granted Jernigan=s motion to dismiss and
severed Langley=s claims against Jernigan.  The
dismissal order did not specify the grounds upon which the motion was being
granted.

                                      ADEQUACY
OF THE REPORTS

An expert report can be challenged by a motion to dismiss.  Chandler v. Singh, 129 S.W.3d 184, 187 (Tex. App.CTexarkana 2004, no pet.).  The
trial court must grant the motion if it appears, after hearing, that the report
did not represent a good‑faith effort to comply with the definition of an
expert report.  Id. at 188.  In determining whether the report represented
a good‑faith effort, the trial court's inquiry is limited to the four
corners of the report.  Palacios,
46 S.W.3d at 878.  We review the court=s decision by an abuse-of-discretion standard.  Id.

Omission of any of the statutory elements prevents the report from being
a good‑faith effort.  Id. at 879.  The report must meet three requirements as
to each defendant: it must (1) state an applicable standard of care, i.e.,
what an ordinarily prudent physician would do under the same or similar
circumstances; (2) indicate how the defendant breached the standard of care by
stating what actions taken or not taken by the defendant deviated from the
standard of care, i.e., a "fair summary" of the care which was
expected, but not given; and (3) contain information on causation.  See Chandler, 129 S.W.3d
at 188.  A "good‑faith"
effort requires that the report discuss the standard of care, breach, and
causation with sufficient specificity to inform the defendant of the conduct
the plaintiff has called into question and to provide a basis for the trial
court to conclude that the claims have merit. 
Id.

We have reviewed the expert reports filed on Langley=s behalf, using the
standards set out above.  In our original
opinion on remand and two opinions denying rehearing, all three of which have
now been withdrawn, we unanimously concluded (that is a total of 9 votes) that
the trial court acted within its discretion in determining from the four
corners of the two expert reports that the experts did not adequately discuss
the standard of care, breach, and causation with sufficient specificity to
inform Jernigan of his conduct that was being called into question.  In all three of those prior opinions we
overruled issues two and three.

While I may admire the persistence of a former staff attorney for this
court, I continue to believe that our prior analysis was correct.  Accordingly, I do not join the other justices
in now reaching the opposite conclusion. 
We properly evaluated the reports and found them wanting as to
Jernigan.  Accordingly, I would still overrule
issues two and three.

                                             EXTENSION
OF TIME

      Langley=s final issue argues that the court should have allowed her additional
time to file a new or supplemental expert report.  Section 13.01 of article 4590i provided two
methods by which a claimant could receive an extension to the 180‑day
deadline.  The two sections are section
13.01(f), which is not relevant to this proceeding, and section 13.01(g).  Section 13.01(g) provides if "the court
finds that the failure of the claimant or the claimant's attorney was not intentional
or the result of conscious indifference but was the result of an accident or
mistake, the court shall grant a grace period of 30 days to permit the claimant
to comply with that subsection."  Russ
v. Titus Hosp. Dist., 128 S.W.3d 332, 336 (Tex. App.CTexarkana 2004, pet. denied).  An
extension under section 13.01(g) could be obtained for either 1) a failure to
file a report or 2) for the failure to file an adequate report; provided the
failure was not intentional or a result of conscious indifference.  See Walker, 111 S.W.3d at 61.

We review the decision to grant or deny the 30-day grace period under an
abuse-of-discretion standard.  Walker, 111 S.W.3d at 62.

Langley=s counsel testified at
the hearing that he believed that the reports were sufficient because Jernigan
was mentioned in one of the reports and the facts stated in the reports were
sufficient to point to the conduct or lack thereof that resulted in John=s death.  

Counsel=s conclusory testimony
is not sufficient to show that the failure to file an adequate report regarding
Jernigan was not the result of conscious indifference or intentional conduct,
but a mistake.  See Walker, 111
S.W.3d at 65 (Awhen a claimant files a
report that omits one or more of section 13.01(r)(6)'s required elements, a
purportedly mistaken belief that the report complied with the statute does not
negate a finding of >intentional or
conscious indifference=@); Hansen v. Starr,
123 S.W.3d 13, 21 (Tex. App.CDallas 2003 pet.
denied). 

For a situation like this, the gross inadequacy of the reports is all
the evidence necessary to controvert Langley’s evidence, which was
only the conclusory testimony of her attorney, that the inadequate report was
the result of a mistaken belief that they complied with article 4590i.  The fact that one of the reports did not even
mention Jernigan should not go unnoticed or unmentioned.  How could anything in that report put
Jernigan on notice of its application to him particularly when the report in
which he was referenced only one time did not make any reference to the other
report.  And because his relationship to
the hospital, other doctors, or his involvement in the treatment of Langley was
not mentioned in either report, other than it was “discussed” with him, we do
not know if any other statement from either report was even being made in
reference to Dr. Jernigan, the standard of care applicable to him, what he did
to breach an indeterminate standard, or what was proximately caused as a result
of the unknown breach of the unknown standard.

Additionally, there is one interesting factor in this case not present
in most.  A very detailed supplemental expert
report was filed by Langley shortly before the hearing.  It
was addressed solely to the case against Jernigan.  This was in the record of the hearing and
could be considered by the trial court for any proper purpose.  I have set out the full text of this report
in Appendix D.

What could the trial court have properly considered the supplemental
report for?  Several things.  First it raised some issue about the
credibility of counsel’s testimony regarding the original reports.  Counsel testified he believed the initial
reports were adequate.  If they were, the
new report added nothing so why did counsel file it?  It was filed so late it certainly could not
have accomplished the purposes for which the initial report is required.

Further it vividly displays a level of information far in excess of the
original report.  It is still a very high
level summary, but it is very informative of the theory of liability now
pursued against Jernigan.

But this late-filed report dramatically highlights the lack of any
theory as against Jernigan in the original reports.  It would have been obvious to anyone who
compared the supplemental report to the original report, that the original
report did not in any way accomplish the purpose of such a report.  When a reader gets to the end of the original
reports, they are not empowered with the knowledge to answer the question –
what did Dr. Jernigan do wrong?  After
the reader looks to the supplemental report, I challenge the reader to find in
the original reports even the skeletal outline of the theory of negligent
supervision which is in the supplemental report.

Thus, the trial court could have easily come to the conclusion, even if
all three elements were referenced, that the original reports could not have
possibly been a good faith effort on the part of Langley and her counsel to
inform Jernigan of the theory of liability as to him, and thus dismissed the
appeal.

Thus, I would overrule issue four.

SECOND FURTHER MOTION
FOR REHEARING

      In yet another motion for
rehearing, Langley asks that we reconsider our opinion on remand, saying that we extended
the rule of Walker v. Gutierrez to
include all reports that fail the “good faith” requirement and not just those
that omit a statutory element.  Walker v. Gutierrez, 111 S.W.3d 56 (Tex. 2003).  Saying that we
erroneously combined the Palacios and
Walker holdings, Langley essentially
argues that because the report addressed all three elements and the only
evidence before the trial court on the “intentional or conscious indifference”
question was the allegedly uncontroverted testimony of counsel that he believed
that the report was adequate, the trial court had no discretion other than to
allow a grace period in which to file an amended report.

      Dr. Jernigan filed a response
to the motion for rehearing, in which he outlines the differences in the
questions addressed by the Supreme Court’s two opinions.  Under article 4590i, the test is two-pronged:
first, the report filed must constitute a good-faith effort to comply with the
statutory requirements; second, if it does not, under what circumstances may
that failure be deemed the result of an accident or mistake rather than of
intentional conduct or conscious indifference?  
Palacios addresses the first
prong; Walker the second.

      Walker holds that “a purported mistaken belief that the report
complied with the statute does not negate a finding of ‘intentional or
conscious indifference.’”  Walker, 111 S.W.3d at 65. Although there are factual differences in the
reports and the lawyers’ testimonies here and in Walker, we have previously concluded in the two opinions on rehearing that have
been withdrawn, the rule announced in Walker applies to this case.  I believe
we were correct in that conclusion.  I
still do.

      Langley impliedly concedes the
deficiency in the reports by her efforts to cobble together the necessary
contents of an expert report from various scattered comments from the two reports
at issue.  Langley does this by taking
statements from the two reports that, based upon the reports, had no rational
connection to Jernigan, and arguing those disconnected statements met the
necessary contents of an expert report as to Jernigan.  To highlight this effort, I have included as
Appendix C the text of a chart which is the summary and centerpiece of Langley’s argument.  Note that when you compare the statements
from the actual text of the expert reports, appendices A and B, to the necessary
contents for an adequate expert report as required by article 4590i, there is
no expressed relationship between the statements in the reports and Jernigan.

      The majority says Dr. John
Jones was a medical resident under the supervision of Jernigan.  But I find this nowhere within the reports
that the trial court, or this Court, could consider in determining the adequacy
of the expert reports, but only in the late-filed report.  See Appendix
D.  But then I am not sure what inference
the reader is suppose to draw from this. 
It is obviously a reference to negligent supervision, but there is
absolutely nothing in the expert reports under review, appendices A and B, to
support such a claim.  It does, however,
reveal the fundamental disconnect between the reports originally filed and
Jernigan, which connection is only made in the supplemental report, filed
shortly before the hearing.  See Appendix D.

       But when we turn to what the majority
relies upon as the expert’s reports’ reference to the alleged breach, you can
see the tremendous stretch to reach the desired result.  The Court states that Jernigan’s breach of
the standard of care is included in the report by the following statement:  “At 4:30 p.m.
his case was discussed with Dr. Jernigan and at 4:50
 p.m. a lactulose enema was ordered.”  This statement, according to the majority,
was sufficiently specific to inform Jernigan that he had breached the standard
of care which allegedly required that a “surgical consultation should have been
obtained once the x-rays demonstrated obstruction” because “it is clear that
Dr. Jernigan did not order a surgery consult at this point.”  Majority Opinion after remand, at pg. 5.  To me there is simply too great of a leap
required to draw the alleged breach from the sole statement regarding Jernigan
in the reports.  It is not at all clear
that Jernigan was aware of the contents of the x-ray, or when the surgical
consultation was recommended, or who ordered it.  The majority gives Langley
the benefit of inferences they want to make.

       While the new majority opinion recites
the proper standards, it fails to apply them. 
It draws these inferences in support of the non-movant and gives the
trial court’s determination no deference. 
This is exactly what the Court of Appeals did in Palacios.  Palacios v. American Transitional Care Ctrs.
of Tex., Inc., 4 S.W.3d 857 (Tex. App.—Houston
[1st Dist.] 1999).  They were
reversed.  American
Transitional Care Ctrs. of Tex., Inc. v.
Palacios, 46 S.W.3d 873 (Tex. 2001).  The majority should also be reversed.

      The majority’s failure to
follow the applicable standards is well demonstrated in its response to this
dissent.  The majority uses an excerpt
from the house bill analysis in an effort to define the purpose of article
4590i.  Then they promptly ignore it.

      The portion of the house bill
quoted is as follows:

CSHB 971 is a reasonable compromise that would help focus judicial
resources on legitimate claims while protecting the rights of plaintiffs to sue
when they are injured. . . . Reducing the number of frivolous lawsuits filed
against doctors and other health care professionals and making the malpractice
litigation system more efficient would allow doctors to spend less time in the
courtroom and more time treating patients.

 

What the majority ignores is “the compromise.”  The compromise is that to pursue a claim
against a doctor you must show the trial court, as provided by the statute, in
a manner provided by the statute, that your claim has merit.  The trial court’s task, to achieve the
benefits sought by the statute as described in the bill analysis of “[r]educing
the number of frivolous lawsuits filed against doctors and other health care
professionals and making the malpractice litigation system more efficient …
[to] allow doctors to spend less time in the courtroom and more time treating
patients” is to review the timely-filed expert reports and determine if the
claim has merit.  It is then our duty,
upon a proper presentation of the issue, to determine if the trial court abused
its discretion.

      This is where the compromise
becomes evident.  You can still sue any
doctor, but failure to follow the required procedure has consequences.  Failure to follow rules established to
achieve so great and grand an objective as by “making the malpractice litigation
system more efficient … [to] allow doctors to spend less time in the courtroom
and more time treating patients” should have consequences.  “Rules without penalty are merely suggestions.”  (Author unknown.)  Failure to follow the required procedure to
bring a medical malpractice claim results in dismissal of the claim.  Tex.
Rev. Civ. Stat. Ann. art. 4590i, § 13.01(e) (repealed 2003).  That means that no matter how meritorious a
claim may be, failure to follow the procedure established will result in dismissal.  Id.

          The trial court performed
its assigned task.  The trial court
reviewed the affidavits and determined that, at least as to Dr. Jernigan, the
initial two expert reports did not represent a good faith effort to comply with
article 4590i.  We should now perform our
task.  Our task is to review the trial
court’s determination under an abuse-of-discretion standard.  This standard of review is one of the most difficult standards of review to
apply.  It is an easy test to state and
most people have some notion of what it means just by the label.  It becomes a bit more problematic, however,
when you actually try to define the standard. 
It serves no useful purpose here to catalog all the different ways that
the test has been described to try to actually define how to objectively test a
trial court’s decision by an abuse-of-discretion standard.  Probably the most complex test is the one
defined by Justice John Powers in Landon
v. Jean-Paul Budinger, Inc., from the Austin Court of Appeals in 1987.  Landon
v. Jean-Paul Budinger, Inc., 724 S.W.2d 931, 934-937 (Tex. App.—Austin 1987, no writ).  The test is cumbersome and time consuming.  Parties do not brief in light of this
description of the test because courts seldom attempt to use it.  At the other end of the spectrum of
descriptions for the abuse-of-discretion standard of review would be something
like, the trial court’s decision is “arbitrary or unreasonable.”  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985).

          The
Court’s failure to conduct a proper review is documented on the face of the
opinion.  The majority is not reviewing
the trial court’s decision, because they have performed the trial court’s task
and have decided that the suit is not frivolous.  Majority opinion at pg. 11.  (“After reviewing the four corners of the two
expert reports, we believe that the lawsuit against Dr. Jernigan is not
frivolous.”).  The Court’s statement is
much like the statement made by the lower court in Downer.  There, the court of
appeals stated, “The facts of the case simply do not, in our opinion, show this
to be an appropriate case to impose the ultimate sanctions of striking the
pleadings and entering default judgment.” 
Id. at 241. 
The Supreme Court interpreted “that statement to mean that the court of
appeals disagreed with the decision of the two trial judges who reviewed the
matter.”  Id.

          It
is worth repeating, our task is to review the trial court’s decision for an
abuse-of-discretion.  This standard has
been stated many different ways.  

The test for abuse of discretion is not whether,
in the opinion of the reviewing court, the facts present an appropriate case
for the trial court's action.  Rather, it
is a question of whether the court acted without reference to any guiding rules
and principles.  Craddock v. Sunshine Bus Lines, 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Comm.App.--1939,
opinion adopted).  Another way of stating
the test is whether the act was arbitrary or unreasonable.  Smithson
v. Cessna Aircraft Co., 665 S.W.2d 439, 443 (Tex.1984); Landry v. Travelers Insurance Co., 458
S.W.2d 649, 651 (Tex.1970).  The mere
fact that a trial judge may decide a matter within his discretionary authority
in a different manner than an appellate judge in a similar circumstance does
not demonstrate that an abuse of discretion has occurred.   

 

Downer, 701 S.W.2d at 241-242.

      The two timely-filed expert
reports presented on Langley’s behalf mention five doctors. 
The only reference to Jernigan is that the case “was discussed” with
him.  Even if we assume that the reports
address the standard of care with respect to each doctor, an assumption that
would be very controversial given the text of these reports and upon which one
doctor, Dr. Carpenter, has already been dismissed from this suit, neither
report addresses how Dr. Jernigan
breached the standard or how his unstated breach of duty caused John’s death
with sufficient specificity for the trial court, and Jernigan, to determine that
the allegations against Jernigan had any merit. 
Thus at least two of the three required elements as to Dr. Jernigan are
missing from the originally-filed reports. 
On this analysis, we previously concluded that the trial court did not
abuse its discretion in concluding that the reports did not represent a good
faith effort to comply with article 4590i. 
That is a conclusion to which I still adhere.

      Langley’s motion for
rehearing should be denied.

CONCLUSION

The Texas Supreme Court overruled Langley=s first issue.  We should overrule the second, third, and
fourth issues, and the motion for rehearing. 
Accordingly, we should affirm the
judgment.  Because the majority reverses
the trial court’s judgment, again, I respectfully dissent, again.

 

 

                                                          TOM GRAY

                                                          Chief
Justice

 

Dissenting Opinion delivered and filed March 2, 2005




APPENDIX A

 

Dear
Ms. Donnel:

 

I
have reviewed the materials that you sent me concerning the case of John
Langley.  These were essentially confined
to the records and X-ray films of The Providence Hospital Center in Waco, Texas. 
Briefly, Mr. Langley was a 46 year old man who was previously in good
health but who presented to the Emergency Department of Providence Health
Center at 6:40 in the morning of October 6, 1996.  His
complaint was abdominal pain and 36 hours without any bowel movements.  An X-ray of his abdomen showed a large amount
of fecal material in his colon.  There is
very little information concerning this first visit to the Emergency Room but
his discharge diagnosis was fecal impaction and he was given a gallon of
GoLytely with instructions to take one glass every 10 minutes and return prn.

 

At
about 11:00
 am Mr. Langley came
back to the Emergency Room because he still had not had a bowel movement and
his abdominal pain was worse.  An NG tube
was put in and 800 cc evacuated from his stomach.  He was then given a Gastrografin enema which
revealed a large plug of stool above the sigmoid colon which appeared to be
acting as a ball-valve since it could be moved proximally with pressure from
the enema.  Following evacuation,
however, it returned to the distal descending colon where it appeared to be
acting as a ball-valve.  At the time of
his second visit to the Emergency Room Mr. Langley was vomiting and therefore
was admitted to the hospital.  He was
then treated with Lactulose and enemas to try and relieve his apparent
obstruction.  By three in the afternoon
the patient was increasingly uncomfortable and was given Ativan for his
agitation.  The enemas were continued.  By 6:00 pm his status seemed to have changed considerably
and at 6:40
 pm he was seen by Dr.
Jones who called Dr. Turney, a surgeon. 
Dr. Turney did not arrive until 8:30 and at that time described Mr. Langley as being “in extremis,”
representing a dramatic change over about 2½ hours.  His diaphragms were high and his abdomen was
very hard.  He had no bowel sounds.  X-ray showed his colon to be massively
dilated.  His blood pressure could not be
obtained and it was felt that he should be operated on as soon as possible.

 

Other
consultations took place but the patient went to the operating room at 9:45 pm for abdominal exploration.  By this time he was confused and sweating
with a massively distended abdomen.  At
surgery he was found to have fecal impaction in the descending colon, with
massive dilation of the small and large bowel above it.  There was also clinical evidence of ischemia
of most of the small bowel and part of the colon.  Because of the patient’s precarious condition
it was felt that removal of that portion of the bowel would not be tolerated at
that time.  The patient did poorly
overnight and was reoperated on the next day, on October 7th, at
10:25 am at which time a large amount of ischemic bowel was removed that
included the distal small bowel from the mid-jejunum on and the entire right
colon and most of the left colon down to the sigmoid colon.  The patient continued to do poorly and died
on October 8th at 7:20 am.

 

It
is my opinion with a reasonable degree of medical certainty that Mr. Langley’s
care was below the acceptable standard of care at several points.  At the time of his first admission for
constipation and fecal impaction, he was given a large amount of an oral
cathartic, GoLytely, to be taken by mouth above the obstruction without knowing
the nature of the obstruction itself. 
This is not an appropriate use of this drug nor is it appropriate to
give a cathartic above a potential obstruction without knowing the location and
nature of the obstruction.  I believe
that this overloading of the gastrointestinal tract was directly responsible
for the ischemia of the small bowel and the colon that was later found at
surgery.

 

When
Mr. Langley returned to the hospital at 11:30 am, he was clearly obstructed and the Gastrografin
enema was an appropriate approach to determine the nature of this.  This should have been done earlier in the
morning.  However at this time it was not
recognized how seriously ill Mr. Langley was and a surgical consult was not
obtained until much later in the day.  By
the time a surgical consult was obtained and Mr. Langley was taken to the
operating room he had necrosis of most of his bowel.  Moreover, his general condition was already
very bad.  The afternoon was critical in
Mr. Langley’s care because his condition deteriorated rapidly betwween  [sic] 6:00 pm and 8:30.  It is therefore my opinion
within a reasonable degree of medical certainty that surgery a few hours
earlier more probably than not would have saved his life.

 

In
summary, Mr. Langley died because his bowel obstruction was treated
inappropriately at the time of his first visit to the Emergency Room.  It is probable that he could have been
salvaged had the nature and seriousness of his condition been recognized at the
time of his second visit to the Emergency Room and during the afternoon and evening
following that.

 

Thank
you very much for asking me to review this case.

 

Sincerely
yours,

 

 

Charles
F. McKhann, MD                                          Albert
Weihl, M.D.




APPENDIX B

 

Dear
Attny. Donnell:

 

I
have reviewed the medical records of the Providence Health Center of Waco,
Texas, as well as the x-ray films and reports on John Langley.

 

Based
on my review of these records and x-rays, it is my opinion within a reasonable
degree of medical certainty that there were serious deviations from the
standard of medical care by several physicians at the hospital on October 6,
 1996, which directly
resulted in the death of John Langley from bowel infarction.

 

It
is my opinion that the giving of Golytely by Dr. Gene E. Walker aggravated the
bowel obstruction and led to its infarction, and the patient’s death.  Within a reasonable degree of medical
certainty, I believe it was a deviation from the standard of care to prescribe
Golytely in the absence of a physical examination and without first determining
that there was no lesion or obstruction of the colon responsible for his unremitting
constipation.  Instead of being examined,
the patient was discharged to take Golytely at home.

 

Upon
his return to the emergency room a few hours later at 11:04 a.m., a nasogastric tube was passed and 1:05 p.m. a hypaque enema was performed.  That showed moderate colonic dilation, a
great amount of stool in both the right and left colon, and an obstructing
fecalith in the sigmoid.  No
sigmoidoscopy was carried out to determine whether that fecalith could be removed
or broken up.  At 2:50 p.m. the resident, Dr. Jones, wrote an order for
lactulose which I believe only added to the problem.  Both of these agents, the Golytely and the
lactulose, cause an exudation of fluid into the small intestine, which made it
swell and in this case so much that the intraluminal pressure of the intestine
was greatly increased and that, in turn, impeded the blood supply to its wall
and ultimately led to ischemic infarction. 
With a reasonable degree of medical certainty I believe that it was a
deviation from the standard of care not to sigmoidoscope the patient and to add
lactulose to the already partially obstructed bowel.

 

Needless
to say, surgical consultation should have been obtained once the x-rays
demonstrated obstruction.  The delay in
obtaining that surgical consultation led to the death of the patient.

 

He
had been admitted to the floor at 3 p.m. with a blood pressure 162/122, a pulse of 104 and was very
uncomfortable.  At 4:30 p.m. his case was discussed with Dr. Jernigan and at
4:50
 p.m. a lactulose enema
was ordered.  By 6:00 p.m., there was massive colonic distension, the
cecum was dilated to about 15 cm, a change in the patient’s status that led to
a call to the gastroenterologist, Dr. Carpenter, at 6:35 p.m.  He
arrived at 7:00
 p.m.  The surgeons, Drs. Turney and Hoffman were
called at 6:40
 p.m., but unfortunately
they did not arrive until 8:30 p.m. and at 8:45 p.m. noted the patient to be “in extremis.”  Surgery was carried out at 9:50 p.m. when obvious infarction of the bowel was
present and only an end colostomy was performed with bowel decompression; the
patient was returned to the operating room at 10:25 a.m. the next morning when resection of most of the
colon and ileum and jejunum were carried out.

 

The
patient died on October 8, 1996 at 7:20 a.m. some 49 hours after initial presentation.  It is my opinion with a reasonable degree of
medical certainty, that he died directly as a result of the actions taken or
not taken above.

 

If
I can be of any further assistance, let me know.

 

Very
truly yours,

 

 

 

Howard
M. Spiro, M.D.




APPENDIX C

 


 
 
 section 13.01(r)(6)
 requires:
 
 
 provided by this report:
 
 
 by this language:
 
 
 
 
 who was negligent
 
 
 Dr. Spiro
 
 
 “there were serious
 deviations from the standard of medical care by several physicians” (II CR
 329);
  
 “At 4:30 p.m. his case was discussed with Dr. Jernigan” (II CR
 330).
 
 
 
 
 standard of care
 
 
 Dr. Spiro
 
 
 “surgical consultation
 should have been obtained once the x-rays demonstrated obstruction” (II CR
 329).
 
 
 
 
 breach of standard of care
 
 
 Dr. Spiro
  
  
  
  
 Drs. McKhann/Weihl
 
 
 “The surgeons, Drs. Turney
 and Hoffman were called at 6:40 p.m., but unfortunately they did not arrive until 8:30 p.m” (II CR 330).
  
 “a surgical consult was not
 obtained until much later in the day” (II CR 327).
 
 
 
 
 causal connection to injury
 
 
 Dr. Spiro
  
  
  
 Drs. McKhann/Weihl
 
 
 “The delay in obtaining
 that surgical consultation led to the death of the patient” (II CR 329).
  
 “By the time a surgical
 consult was obtained and Mr. Langley was taken to the operating room he had
 necrosis of most of  his bowel” (II CR
 327).
  
 “The afternoon was critical
 in Mr. Langley’s care because his condition deteriorated rapidly between 6:00 pm and 8:30.  It is therefore my opinion within a
 reasonable degree of medical certainty that surgery a few hours earlier more
 probably than not would have saved his life” (II CR 327).
 
 


 

            This
is an excerpt from Langley’s brief
in the Court of Appeals.




APPENDIX D

 

Report of Charles F. McKhann,
M.D., on John Langley

 

I am a general surgeon, certified
by the American Board of Surgeons in 1965. 
I have been licensed in Massachusetts,
Minnesota, and Connecticut.  The licenses in Massachusetts
and Minnesota were allowed to
lapse but I have been continuously licensed in Connecticut
for 21 years.  My practice is primarily
in surgical oncology with a special interest in breast cancer.  I have been actively seeing and operating on
patients in Connecticut since
1980 and continue to do so on a daily basis.

 

It is my opinion that the
attending physician, Dr. Floyd Jernigan, breached the standard of conduct for
an attending surgeon supervising a resident in that he did not understand the
potential nature of Mr. Langley’s problem and did not monitor Dr. Jones closely
enough.  Mr. Langley had signs of
constipation and potential obstruction dating back several days before he came
into the hospital on October 6.  He had
already taken significant steps to get his bowel to move.  In the emergency room early in the morning of
October 6 he was given a gallon of Golitely and was discharged.  He came back to the emergency room later in
the morning at about 11:00 because he
had more pain and his bowel had still not moved.  This resistance to treatment should have
suggested true obstruction.  At 4:30 in the afternoon Dr. Jernigan was
contacted by Dr. Jones concerning the patient’s lack of response to
conservative measures.

 

I believe that Dr. Jones should
have been instructed by Dr. Jernigan to keep Dr. Jernigan informed about such
patients much earlier in the hospital course, in this case as early as 2:30 in the afternoon.  At 4:30
Dr. Jernigan did not come in to see the patient.  Around 6:00
Dr. Jernigan approved consultations with Dr. Turney and Dr. Carpenter.  Dr. Turney was not asked to see the patient
at this time.  Dr. Jernigan was called
again around 6 p.m. and arrived at
the hospital and saw the patient with Dr. Carpenter, a Gastroenterologist, at
around 7 p.m.  Dr. Turney, the surgeon, had already been
called at the request of Dr. Carpenter. 
I believe that as early as 4:30 p.m.
Drs. Carpenter and Turney should both have been asked to see this patient and
that Dr. Jernigan should have seen the patient by that time and should have
requested the consultations himself.

 

In my opinion Dr. Jernigan’s
supervision of his resident, Dr. John Jones, was inadequate throughout the
entire afternoon.  The attending
physician has a responsibility to make clear to the resident what are the minimum
circumstances under which the attending should be called, and to see patients
who meet these minimum criteria as soon as reasonably possible after being
notified.  This entire process should
have begun as early as 2:00 or 2:30 in the afternoon, when Dr. Jones first
became involved with Mr. Langley’s care. 
The role of the attending is that of teacher and responsible physician
and makes him ultimately responsible for all of the activities of the resident
with respect to patient care.  Earlier
recognition of the problem and earlier surgery might have saved Mr. Langley’s
life.

 

                                                                        Signed
by Charles F. McKhann, M.D.

                                                                                    July 21, 2000











   [1]  Article 4590i was amended in 1995 to include
the requirements of an expert report and curriculum vitae.  Act of May 18, 1995, 74th Leg., R.S., ch.
140, 1995 Tex. Gen. Laws 985, 986, repealed by Act of June 11, 2003,
78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847, 884.  The article has been moved to Chapter 74 of
the Civil Practice and Remedies Code. 
For a discussion of the changes, see Justice George C. Hanks, Jr. and
Rachel Polinger-Hyman, Redefining the Battlefield: Expert Reports in Medical
Malpractice Litigation After H.B.4, Hous.
Law., July-Aug. 2004, at 25.  And,
although it has been repealed by the codification, I refer throughout this
opinion to the version in effect at the time Langley=s claims were dismissed as Aarticle 4590i.@