IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00297-CV

 

Hillcrest Baptist Medical Center,

                                                                      Appellant

 v.

 

Penny Wade,

                                                                      Appellee

 

 

 



From the 170th District Court

McLennan County, Texas

Trial Court No. 2004-1405-4

 



O p i n i o n



 

This is a medical malpractice case
involving heart damage resulting from a delayed angioplasty.  Penny Wade sued Hillcrest Baptist Medical Center, two emergency room doctors, and their employers, under
Chapter 74 of the Texas Civil Practice and Remedies Code.  Hillcrest challenged
the sufficiency of Wade’s expert reports for failure to include the causation
element as to Hillcrest and its nursing staff.  The trial court denied
Hillcrest’s motion to dismiss.  Hillcrest appeals in two issues: (1) trial
court abused its discretion in denying Hillcrest’s motion to dismiss; and (2)
Wade would not be entitled to a thirty-day extension to cure any deficiency in
her expert reports.

We will overrule the first issue and
affirm the judgment, so we do not reach the second issue.

BACKGROUND

Facts

On February 4, 2002 at 3:45 a.m.,
Wade, a thirty-eight year old woman, went to Hillcrest Emergency Department
complaining of a cough and chest pains.  At 3:52, she was triaged by a triage
nurse, who noted that she smoked a pack of cigarettes a day but did not note
Wade’s positive family history of coronary artery disease.  Approximately 30
minutes later, a treating night-shift nurse assessed Wade but did not place
Wade on a cardiac monitor.  At 5:07, Dr. Norwid, an emergency room physician,
saw Wade, and he ordered an electrocardiogram (“EKG”) and lab tests.  Wade was
then transferred to a bed with a cardiac monitor and an acute myocardial
infarction (AMI) protocol was initiated.  The EKG, performed at 5:26, was
described by Dr. Norwid as “worrisome.”  The EKG had deep Q waves and a bit of
ST elevation from V1 though V4.  Dr. Norwid left at the end of his shift and
turned Wade’s care over to Dr. Welter, another emergency room physician.  At
5:40, a Nitroglycerin drip was reducing Wade’s pain from an “eight out of ten”
to a “three out of ten.”  By 6:15, her pain was down to a “one out of ten.”

At 7:00, a treating day-shift nurse
assumed care of Wade from the treating night-shift nurse.  At 7:31, a second
EKG was performed, and additional blood for lab tests was drawn at 8:40.  The
second EKG demonstrated changes from the earlier EKG; there was now ST segment
elevation in the lateral leads.  The cardiac enzymes were also remarkably
elevated.  Wade was then sent for a CT scan without a cardiac monitor and
without a registered nurse trained in Advanced Cardiac Life Support (ACLS). 
Between 9:15 and 10:30, Wade vomited twice and her blood pressure dropped
slightly.  She was treated with Phenergan and a saline bolus.

A cardiologist was reviewing EKGs in
the heart station, and after reviewing Wade’s EKGs, was concerned and proceeded
to the emergency room.  The cardiologist saw Wade at 11:10, and she was taken
to the cardiac catheterization lab at 12:05 p.m. where angiograms demonstrated
a 100% occlusion of the left anterior descending coronary artery.  The occluded
artery was treated with balloon angioplasty and stenting.  According to Wade’s
physician-experts, Wade now has significantly impaired cardiac ejection
fraction, requires an implantable cardioverter/defibrillator, and may possibly
require a heart transplant in the future.

The relationship of the defendants
in the underlying medical malpractice case is not entirely clear from the
record.  It appears that Hillcrest’s liability would be based on, at a minimum,
any negligence by its nursing staff, which will be the subject of our inquiry.

Expert Reports

Wade filed three expert reports from
two physicians and one nurse.

Nurse Nelson-Richardson Expert
Report

Nurse Nelson-Richardson is an
emergency nurse.  She explains in her report that the national standard of care
for emergency rooms is to have an AMI protocol to ensure that patients
experiencing an AMI are rapidly recognized, to limit damage done by cardiac
ischemia.  She stated: “The very purpose of the AMI protocol used by Hillcrest Baptist Medical Center was to provide a clinical pathway to expedite patients
with AMI to receive definite medical treatment.”  She also stated: “The
standard of care for all phases of the management of the patient with potential
AMI is to limit the time the heart muscle is being denied adequate oxygen.  The
well known phrase of ‘time means muscle’ well explains the goal of care for
these patients.”  The AMI protocol allows a maximum time of 60 minutes to make
a decision to administer thrombolytics or send for coronary angioplasty.  An
EKG must be done within ten minutes and no longer than 20 minutes after the
patient arrives in the emergency room.

The standard of care for a triage
nurse is to be able to quickly recognize possible AMI patients and ensure there
is no delay in physician management or the taking of an EKG.  Nurse
Nelson-Richardson stated that the triage nurse at Hillcrest breached her
standard of care and should have recognized Wade’s AMI symptoms and risk
factors and taken her to a cardiac monitor bed and obtained an EKG within ten
minutes of Wade’s arrival (at the most within twenty minutes of her arrival).

If the triage nurse fails to
recognize AMI symptoms, the treating nurse must seek immediate physician
evaluation and an EKG.  Because the triage nurse failed to recognize Wade’s AMI
symptoms, the treating nurse had the responsibility to summon the physician and
obtain an EKG as quickly as possible.  Instead, a physician did not see Wade
until approximately one hour after her arrival, and an EKG was not performed
for one-and-one-half hours after Wade presented to the triage nurse.  Thus,
Nurse Nelson-Richardson also concluded that this treating nurse at Hillcrest
breached her standard of care.

Nurse Nelson-Richardson also stated
that “all nursing care is based on assessment.”  She stated that it is the
treating nurse’s duty to continually reassess a patient’s condition.  For a
patient with chest pain, like Wade, the pattern of pain levels and response to
the Nitroglycerin should be presented to the physician and repeat EKGs should
be obtained with any episodes of pain or changes in condition such as
vomiting.  Nurses do have a duty to recognize acute changes on serial EKGs. 
She stated that it is also a nurse’s duty to recognize that a patient with
chest pain, ST segment elevation, and elevated cardiac enzymes must be
evaluated for emergency thrombolytics or cardiac catheterization.  Nurse
Nelson-Richardson found that the treating nurse at Hillcrest knew Wade had
vomited twice and had unresolved pain, and that the treating nurse should have
recognized the changes between the two EKGs and that the Nitroglycerin did
relieve Wade’s pain.  She stated that this treating nurse did not pursue the
physician for emergency consultation with cardiology, and that had repeat EKGs
been performed, they would have more likely than not demonstrated worsening
ischemia.  Thus, Nurse Nelson-Richardson concluded that the treating nurse, who
observed Wade’s symptoms and test results for at least three hours, breached
her standard of care because she should have presented this data to the
physician and requested that cardiology be called immediately.  If the
physician failed to take this action, it was the treating nurse’s duty to
access her chain of command to facilitate Wade’s being evaluated by cardiology.

Dr. Mathews Expert Report

Dr. Mathews is an emergency medicine
doctor.  His report states:

. . .

 

Penny Wade, a 38 year old previously healthy
woman, sought care at the Hillcrest Baptist Medical Center – Emergency
Department on 2/4/02 for the evaluation and treatment of chest pain and cough. 
The symptom of chest pain was severe and seemed to radiate though her chest to
her back.  Pertinent care, while in the Emergency Department, was provided by
Dr. Mark Norwid, Dr. Welter and several emergency department nurses.

 

. . .

 

The above breaches of Drs. Norwid and Welter
resulted in delay of proper treatment of Ms. Wade’s coronary syndrome resulting
in Acute Myocardial Infarction with permanent and severe compromise of cardiac
output function.

 

For the reasons stated above, it is my opinion
that Dr. Norwid and Dr. Welter were negligent, and that their negligence was a
direct and proximately cause of Ms. Wade’s permanently compromised cardiac
function.

 

Dr. Kerber’s Expert Report

Dr. Kerber is an internal medicine
doctor with a subspecialty in cardiovascular diseases.  His report states:

. . .

 

Because Dr. Norwid failed to recognize the
infarction promptly and instead ordered time wasting chest x-ray and CT studies,
the angioplasty was not begun until 12:38 p.m., approximately nine hours after
her arrival at the emergency room.  This was characterized by Dr. Attas [the
cardiologist] as “delayed” rescue percutaneous transluminal coronary
angioplasty and stent procedure.

 

. . .

 

As a result of these breaches of the standard of
care, Ms. Wade’s “delayed” primary angioplasty could no longer salvage
myocardium which was at risk of necrosis (cell death) from the interruption of
blood supply.  Primary angioplasty, performed within the first hour or two
following a myocardial infarction has the potential to minimize the permanent
heart damage which occurs from coronary artery occlusion.  When the angioplasty
is delayed, as was the case here, large portions of the jeopardized myocardium
die, and the result is significant impairment of the pumping action of the
heart.  This generally results in further complications and disability,
including strokes related to embolization of blood clots from the heart (which
Ms. Wade has sustained), further episodes of chest pain (which she has also
sustained) and congestive heart failure.  The progressive worsening of Ms.
Wade’s ejection fraction is very ominous in that ejection fraction is the best
predictor of disability and death from myocardial infarction.  Her most recent
ejection fraction of 20-25% is alarming low.  She has already required an
implantable cardioverter/defibrillator and sustained a transient ischemic
attack (“mini stroke”).  It is highly likely that she will require a heart
transplant in the future if her cardiac function continues to decline.  All of
these complications could have been avoided or at least substantially reduced
had Dr. Norwid followed the accepted standards of care for correct diagnosis
and immediate treatment of acute myocardial infarction.

 

ISSUE ONE: MOTION TO DISMISS

 

Arguments

Hillcrest argues that Wade did not
make a good-faith effort to comply with the expert report requirements as to
Hillcrest.  Hillcrest specifically argues that Wade’s expert opinions fail to
establish a causal relationship between the alleged breaches of the standard of
care by Hillcrest’s nurses and the injuries claimed by Wade.

Wade argues that the report of Nurse
Nelson-Richardson addresses both nursing standards of care applicable to
Hillcrest and breaches of those nursing standards.  Wade asserts that the
nurse’s expert report describe the breaches of the nursing standards of care as
delays in care and errors resulting in delays in care.  Wade acknowledges that
the expert reports by Dr. Mathews and Dr. Kerber address medical standards of
care applicable to the physicians in the emergency room and the breaches of
those medical standards.  Wade asserts that the physician expert reports
describe the breaches of the medical standards of care as delays in care and
errors resulting in delays in care.  Wade also asserts that the physician
expert reports provide expert opinions as to how the delays in care resulted in
the injuries Wade sustained.  Thus, she argues that considering the three
expert reports together demonstrates a good-faith effort to meet the expert
report requirements as to Hillcrest.

Standard of Review

Medical-malpractice plaintiffs must,
within 120 days after the date their claim is filed, serve on each party one or
more expert reports, with a curriculum vitae for each expert, for each
physician or health care provider against whom a liability claim is asserted.  Tex. Civ. Prac. & Rem. Code Ann. §
74.351(a) (Vernon 2005).  If a physician or health care provider files a motion
challenging the adequacy of an expert report, the trial court must grant the
motion “only if it appears to the court, after hearing, that the report does
not represent an objective good faith effort to comply with the definition of
an expert report in Subsection (r)(6).”  Id. § 74.351(l).  An expert
report is defined as “a written report by an expert that provides a fair
summary of the expert’s opinions as of the date of the report regarding
applicable standards of care, the manner in which the care rendered by the
physician or health care provider failed to meet the standards, and the causal
relationship between that failure and the injury, harm, or damages claimed.”  Id. § 74.351(r)(6).  A plaintiff may satisfy the requirements of a good-faith effort
“by serving reports of separate experts regarding different physicians or
health care providers or regarding different issues arising from the conduct of
a physician or health care provider, such as issues of liability and
causation.”  Id. 74.351(c).  However, a nurse is not qualified to render
an expert opinion regarding causation.  Id. § 74.403(a) (Vernon 2005).

We review a trial court’s decision
regarding the adequacy of an expert report by an abuse-of-discretion standard. 
Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873,
877 (Tex. 2001).  In determining whether the report represented a good-faith
effort, the trial court’s inquiry is limited to the four corners of the report
or reports.  Id. at 878.

The expert report(s) must represent
only a good-faith effort to provide a fair summary of the expert’s opinions.  Id.  The report does not have to marshal all of the plaintiff’s proof, and the
plaintiff does not have to present evidence in the report as if it were
actually litigating the merits.  Id. at 878-79.  However, the report(s)
must include each of the statutory elements as to each defendant: (1) standard
of care; (2) breach of the standard of care; and (3) causation.  Tex. Civ. Prac. & Rem. Code Ann. §
74.351(r)(6); see also Chandler v. Singh, 129 S.W.3d 184,
188 (Tex. App.—Texarkana 2004, no pet. h.).  A report does not constitute a
good-faith effort to comply with the statutory requirements if it omits any of
the statutory elements.  Palacios, 46 S.W.3d at 879.  To
constitute a good-faith effort, the report(s) must: (1) inform the defendant of
the specific conduct the plaintiff has called into question, and (2) provide a
basis for the trial court to conclude that the claims have merit.  Id.

Analysis

The care a patient receives in a
hospital does not occur in a vacuum, but rather is a collaborative effort
involving doctors, nurses, and other health care providers.  There was at least
a seven hour delay in Wade’s receiving cardiology care.  We believe that a
delay is a delay.  Nurse Nelson-Richardson’s expert report establishes that the
specific conduct of Hillcrest’s nursing staff that breached the accepted
standards of nursing care delayed Wade from receiving necessary cardiology
care.  Dr. Mathew’s and Dr. Kerber’s reports establish that the delay in Wade’s
receiving necessary cardiology care resulted in permanent and severe compromise
of her cardiac output function with a future heart transplant highly likely. 
These physician expert reports clearly established the pathophysiologic basis
explaining the causal relationship between the delay in Wade’s receiving cardiology
care and her injuries.

The trial court could have concluded
that the three expert reports, considered together, contained the three
statutory requirements as to Hillcrest and its nursing staff.  See Tex. Civ. Prac. & Rem. Code Ann. §
74.351(r)(6).  The three expert reports, considered together, informed
Hillcrest of the specific conduct called into question by Wade and provided a
basis for the trial court to conclude that Wade’s claim had merit.  See
Palacios, 46 S.W.3d at 879.  Thus, after a review of the four-corners of
the three expert reports, we find that the trial court did not abuse its
discretion by denying Hillcrest’s motion to dismiss.  See id. at 877.

We overrule issue one.

CONCLUSION

Having overruled issue one, we need
not address issue two.  We affirm the judgment.

 

BILL VANCE

Justice

 

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

          (Chief
Justice Gray dissenting)

Affirmed

Opinion delivered and
filed August 3, 2005

[CV06]