**HILLCREST BAPTIST MEDICAL CENTER, Appellant,**

v.

**Penny WADE, Appellee.**

No. 10–04–00297–CV.

Court of Appeals of Texas, Waco.

Aug. 3, 2005.

Roy L. Barrett and John A. Powell, Naman, Howell, Smith & Lee PC, Waco, for appellant.

Barry N. Johnson, Needham Johnson PC, Plano, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

This is a medical malpractice case involving heart damage resulting from a delayed angioplasty. Penny Wade sued Hillcrest Baptist Medical Center, two emergency room doctors, and their employers, under Chapter 74 of the Texas Civil Practice and Remedies Code. Hillcrest challenged the sufficiency of Wade's expert reports for failure to include the causation element as to Hillcrest and its nursing staff. The trial court denied Hillcrest's motion to dismiss. Hillcrest appeals in two issues: (1) trial court abused its discretion in denying Hillcrest's motion to dismiss; and (2) Wade would not be entitled to a thirty-day extension to cure any deficiency in her expert reports.

We will overrule the first issue and affirm the judgment, so we do not reach the second issue.

## BACKGROUND

### Facts

On February 4, 2002 at 3:45 a.m., Wade, a thirty-eight year old woman, went to Hillcrest Emergency Department complaining of a cough and chest pains. At 3:52, she was triaged by a triage nurse, who noted that she smoked a pack of cigarettes a day but did not note Wade's positive family history of coronary artery disease. Approximately 30 minutes later, a treating night-shift nurse assessed Wade but did not place Wade on a cardiac monitor. At 5:07, Dr. Norwid, an emergency room physician, saw Wade, and he ordered an electrocardiogram ("EKG") and lab tests. Wade was then transferred to a bed with a cardiac monitor and an acute myocardial infarction (AMI) protocol was initiated. The EKG, performed at 5:26, was described by Dr. Norwid as "worrisome." The EKG had deep Q waves and a bit of ST elevation from V1 though V4. Dr. Norwid left at the end of his shift and turned Wade's care over to Dr. Welter, another emergency room physician. At 5:40, a Nitroglycerin drip was reducing Wade's pain from an "eight out of ten" to a "three out of ten." By 6:15, her pain was down to a "one out of ten."

At 7:00, a treating day-shift nurse assumed care of Wade from the treating night-shift nurse. At 7:31, a second EKG

was performed, and additional blood for lab tests was drawn at 8:40. The second EKG demonstrated changes from the earlier EKG; there was now ST segment elevation in the lateral leads. The cardiac enzymes were also remarkably elevated. Wade was then sent for a CT scan without a cardiac monitor and without a registered nurse trained in Advanced Cardiac Life Support (ACLS). Between 9:15 and 10:30, Wade vomited twice and her blood pressure dropped slightly. She was treated with Phenergan and a saline bolus.

A cardiologist was reviewing EKGs in the heart station, and after reviewing Wade's EKGs, was concerned and proceeded to the emergency room. The cardiologist saw Wade at 11:10, and she was taken to the cardiac catheterization lab at 12:05 p.m. where angiograms demonstrated a 100% occlusion of the left anterior descending coronary artery. The occluded artery was treated with balloon angioplasty and stenting. According to Wade's physician-experts, Wade now has significantly impaired cardiac ejection fraction, requires an implantable cardioverter/defibrillator, and may possibly require a heart transplant in the future.

The relationship of the defendants in the underlying medical malpractice case is not entirely clear from the record. It appears that Hillcrest's liability would be based on, at a minimum, any negligence by its nursing staff, which will be the subject of our inquiry.

### Expert Reports

Wade filed three expert reports from two physicians and one nurse.

### Nurse Nelson–Richardson Expert Report

Nurse Nelson–Richardson is an emergency nurse. She explains in her report that the national standard of care for emergency rooms is to have an AMI proto-col to ensure that patients experiencing an AMI are rapidly recognized, to limit damage done by cardiac ischemia. She stated: "The very purpose of the AMI protocol used by Hillcrest Baptist Medical Center was to provide a clinical pathway to expedite patients with AMI to receive definite medical treatment." She also stated: "The standard of care for all phases of the management of the patient with potential AMI is to limit the time the heart muscle is being denied adequate oxygen. The well known phrase of 'time means muscle' well explains the goal of care for these patients." The AMI protocol allows a maximum time of 60 minutes to make a decision to administer thrombolytics or send for coronary angioplasty. An EKG must be done within ten minutes and no longer than 20 minutes after the patient arrives in the emergency room.

The standard of care for a triage nurse is to be able to quickly recognize possible AMI patients and ensure there is no delay in physician management or the taking of an EKG. Nurse Nelson–Richardson stated that the triage nurse at Hillcrest breached her standard of care and should have recognized Wade's AMI symptoms and risk factors and taken her to a cardiac monitor bed and obtained an EKG within ten minutes of Wade's arrival (at the most within twenty minutes of her arrival).

If the triage nurse fails to recognize AMI symptoms, the treating nurse must seek immediate physician evaluation and an EKG. Because the triage nurse failed to recognize Wade's AMI symptoms, the treating nurse had the responsibility to summon the physician and obtain an EKG as quickly as possible. Instead, a physician did not see Wade until approximately one hour after her arrival, and an EKG was not performed for one-and-one-half hours after Wade presented to the triage nurse. Thus, Nurse Nelson–Richardson

also concluded that this treating nurse at Hillcrest breached her standard of care.

Nurse Nelson–Richardson also stated that "all nursing care is based on assessment." She stated that it is the treating nurse's duty to continually reassess a patient's condition. For a patient with chest pain, like Wade, the pattern of pain levels and response to the Nitroglycerin should be presented to the physician and repeat EKGs should be obtained with any episodes of pain or changes in condition such as vomiting. Nurses do have a duty to recognize acute changes on serial EKGs. She stated that it is also a nurse's duty to recognize that a patient with chest pain, ST segment elevation, and elevated cardiac enzymes must be evaluated for emergency thrombolytics or cardiac catheterization. Nurse Nelson–Richardson found that the treating nurse at Hillcrest knew Wade had vomited twice and had unresolved pain, and that the treating nurse should have recognized the changes between the two EKGs and that the Nitroglycerin did relieve Wade's pain. She stated that this treating nurse did not pursue the physician for emergency consultation with cardiology, and that had repeat EKGs been performed, they would have more likely than not demonstrated worsening ischemia. Thus, Nurse Nelson–Richardson concluded that the treating nurse, who observed Wade's symptoms and test results for at least three hours, breached her standard of care because she should have presented this data to the physician and requested that cardiology be called immediately. If the physician failed to take this action, it was the treating nurse's duty to access her chain of command to facilitate Wade's being evaluated by cardiology.

## Dr. Mathews Expert Report

Dr. Mathews is an emergency medicine doctor. His report states:

. . .

Penny Wade, a 38 year old previously healthy woman, sought care at the Hillcrest Baptist Medical Center—Emergency Department on 2/4/02 for the evaluation and treatment of chest pain and cough. The symptom of chest pain was severe and seemed to radiate though her chest to her back. Pertinent care, while in the Emergency Department, was provided by Dr. Mark Norwid, Dr. Welter and several emergency department nurses.

. . .

The above breaches of Drs. Norwid and Welter resulted in delay of proper treatment of Ms. Wade's coronary syndrome resulting in Acute Myocardial Infarction with permanent and severe compromise of cardiac output function.

For the reasons stated above, it is my opinion that Dr. Norwid and Dr. Welter were negligent, and that their negligence was a direct and proximately cause of Ms. Wade's permanently compromised cardiac function.

## Dr. Kerber's Expert Report

Dr. Kerber is an internal medicine doctor with a subspecialty in cardiovascular diseases. His report states:

. . .

Because Dr. Norwid failed to recognize the infarction promptly and instead ordered time wasting chest x-ray and CT studies, the angioplasty was not begun until 12:38 p.m., approximately nine hours after her arrival at the emergency room. This was characterized by Dr. Attas [the cardiologist] as "delayed" rescue percutaneous transluminal coronary angioplasty and stent procedure.

. . .

As a result of these breaches of the standard of care, Ms. Wade's "delayed"

primary angioplasty could no longer salvage myocardium which was at risk of necrosis (cell death) from the interruption of blood supply. Primary angioplasty, performed within the first hour or two following a myocardial infarction has the potential to minimize the permanent heart damage which occurs from coronary artery occlusion. When the angioplasty is delayed, as was the case here, large portions of the jeopardized myocardium die, and the result is significant impairment of the pumping action of the heart. This generally results in further complications and disability, including strokes related to embolization of blood clots from the heart (which Ms. Wade has sustained), further episodes of chest pain (which she has also sustained) and congestive heart failure. The progressive worsening of Ms. Wade's ejection fraction is very ominous in that ejection fraction is the best predictor of disability and death from myocardial infarction. Her most recent ejection fraction of 20–25% is alarming low. She has already required an implantable cardioverter/defibrillator and sustained a transient ischemic attack ("mini stroke"). It is highly likely that she will require a heart transplant in the future if her cardiac function continues to decline. All of these complications could have been avoided or at least substantially reduced had Dr. Norwid followed the accepted standards of care for correct diagnosis and immediate treatment of acute myocardial infarction.

## ISSUE ONE: MOTION TO DISMISS

### Arguments

Hillcrest argues that Wade did not make a good-faith effort to comply with the expert report requirements as to Hillcrest. Hillcrest specifically argues that Wade's expert opinions fail to establish a causal relationship between the alleged breaches of the standard of care by Hillcrest's nurses and the injuries claimed by Wade.

Wade argues that the report of Nurse Nelson–Richardson addresses both nursing standards of care applicable to Hillcrest and breaches of those nursing standards. Wade asserts that the nurse's expert report describe the breaches of the nursing standards of care as delays in care and errors resulting in delays in care. Wade acknowledges that the expert reports by Dr. Mathews and Dr. Kerber address medical standards of care applicable to the physicians in the emergency room and the breaches of those medical standards. Wade asserts that the physician expert reports describe the breaches of the medical standards of care as delays in care and errors resulting in delays in care. Wade also asserts that the physician expert reports provide expert opinions as to how the delays in care resulted in the injuries Wade sustained. Thus, she argues that considering the three expert reports together demonstrates a good-faith effort to meet the expert report requirements as to Hillcrest.

### Standard of Review

Medical-malpractice plaintiffs must, within 120 days after the date their claim is filed, serve on each party one or more expert reports, with a curriculum vitae for each expert, for each physician or health care provider against whom a liability claim is asserted. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon 2005). If a physician or health care provider files a motion challenging the adequacy of an expert report, the trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id.*

§ 74.351(*l*). An expert report is defined as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). A plaintiff may satisfy the requirements of a good-faith effort "by serving reports of separate experts regarding different physicians or health care providers or regarding different issues arising from the conduct of a physician or health care provider, such as issues of liability and causation." *Id.* § 74.351(c). However, a nurse is not qualified to render an expert opinion regarding causation. *Id.* § 74.403(a) (Vernon 2005).

We review a trial court's decision regarding the adequacy of an expert report by an abuse-of-discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). In determining whether the report represented a good-faith effort, the trial court's inquiry is limited to the four corners of the report or reports. *Id.* at 878.

The expert report(s) must represent only a good-faith effort to provide a fair summary of the expert's opinions. *Id.* The report does not have to marshal all of the plaintiff's proof, and the plaintiff does not have to present evidence in the report as if it were actually litigating the merits. *Id.* at 878–79. However, the report(s) must include each of the statutory elements as to each defendant: (1) standard of care; (2) breach of the standard of care; and (3) causation. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see also Chandler v. Singh,* 129 S.W.3d 184, 188 (Tex. App.-Texarkana 2004, no pet. h.). A report does not constitute a good-faith effort to comply with the statutory requirements if it omits any of the statutory elements. *Palacios,* 46 S.W.3d at 879. To constitute a good-faith effort, the report(s) must: (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Id.*

### Analysis

The care a patient receives in a hospital does not occur in a vacuum, but rather is a collaborative effort involving doctors, nurses, and other health care providers. There was at least a seven hour delay in Wade's receiving cardiology care. We believe that a delay is a delay. Nurse Nelson–Richardson's expert report establishes that the specific conduct of Hillcrest's nursing staff that breached the accepted standards of nursing care delayed Wade from receiving necessary cardiology care. Dr. Mathew's and Dr. Kerber's reports establish that the delay in Wade's receiving necessary cardiology care resulted in permanent and severe compromise of her cardiac output function with a future heart transplant highly likely. These physician expert reports clearly established the pathophysiologic basis explaining the causal relationship between the delay in Wade's receiving cardiology care and her injuries.

The trial court could have concluded that the three expert reports, considered together, contained the three statutory requirements as to Hillcrest and its nursing staff. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). The three expert reports, considered together, informed Hillcrest of the specific conduct called into question by Wade and provided a basis for the trial court to conclude that Wade's claim had merit. *See Palacios,* 46 S.W.3d at 879. Thus, after a review of the four-corners of

the three expert reports, we find that the trial court did not abuse its discretion by denying Hillcrest's motion to dismiss. *See id.* at 877.

We overrule issue one.

## CONCLUSION

Having overruled issue one, we need not address issue two. We affirm the judgment.

Chief Justice GRAY dissenting.

TOM GRAY, Chief Justice, dissenting.

Hillcrest appeals the trial court's denial of its motion to dismiss. We should reverse.

In Hillcrest's first issue, it argues that Wade's purported expert reports fail to provide a fair summary of the experts' opinions of the manner in which Hillcrest's care failed to meet the applicable standards of care. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2004–2005). Though addressing the alleged breaches by Hillcrest's codefendants, the two reports by physicians do not address Hillcrest's conduct, and in particular any causal relationship between Hillcrest's conduct and the injury to Wade. *See Taylor v. Christus Spohn Health System Corp.*, 169 S.W.3d 241, 242–44 (Tex.App.-Corpus Christi 2004, no pet.). Moreover, the nurse who gave Wade's other report is not qualified to render an expert opinion on causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.403(a) (Vernon Supp.2004–2005). The trial court abused its discretion in overruling Hillcrest's motion. *See id.* § 75.351(*l*) (Vernon Supp.2004–2005); *Taylor* at 242–44. We should sustain Hillcrest's first issue.

In Hillcrest's second issue, it contends that the trial court should not grant Wade an extension of time to file a report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (Vernon Supp.2004–2005). Since the trial court has neither granted nor denied Wade an extension, this issue is not ripe. *See* TEX. CONST. art. V, § 6; *McAllen Med. Ctr., Inc. v. Cortez*, 66 S.W.3d 227, 231–34 (Tex.2001); *Waco Ind. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851–53 (Tex.2000). We should overrule Hillcrest's second issue.

We should, after sustaining Hillcrest's first issue, reverse and remand for further proceedings.