

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00191-CV

HILLCREST BAPTIST MEDICAL CENTER
AND HILLCREST HEALTH SYSTEM, INC.,

                                                    Appellant

 v.

LILLIE PAYNE,

                                                    Appellee

**From the 414th District Court
McLennan County, Texas
Trial Court No. 2010-15045**

## MEMORANDUM  OPINION

In this appeal, appellants, Hillcrest Baptist Medical Center ("HBMC") and Hillcrest Health System, Inc. ("HHSI"), complain about the trial court's denial of their joint motion to dismiss a health-care-liability claim brought by appellee, Lillie Payne, on the basis that Payne allegedly failed to timely provide an adequate expert report in compliance with section 74.351 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West 2011). By three issues, appellants assert: (1) Payne's expert was not qualified to opine on causation; (2) Payne's expert reports did

not establish the requisite causal connections between appellants' alleged negligent actions and the injuries sustained; and (3) Payne's expert reports do not adequately address liability as to HHSI. We affirm, in part, and reverse and remand, in part.

## I.    BACKGROUND

This dispute pertains to treatment Payne, then a sixty-year-old woman, received while in HBMC's care. According to Payne, on March 7, 2008, she was admitted to HBMC with a diagnosis of a fever. However, it was later determined that she had sepsis from an infected dialysis shunt. The bacterium that caused the sepsis was discovered to be Methicillin-resistant staphylococcus auerus ("MRSA"). Upon this discovery, Payne was admitted to HBMC's intensive-care unit, and she was placed on a ventilator due to the development of septic shock and respiratory failure. In addition, Payne was "placed on bilateral upper extremity restraints." Payne alleged that "[o]rders for pressure ulcer precautions were instituted on admission" and noted that she has diabetes, hypertension, and end-stage renal failure that required frequent dialysis.

Payne received treatment for the sepsis that she contracted, and she was subsequently discharged from the hospital on April 9, 2008. However, while in the care of HBMC, Payne developed "multiple pressure ulcers" that required "long[-]term, aggressive care[,] and treatment."

Thereafter, Payne filed her original petition, asserting health-care liability claims against HBMC; HHSI; Scott and White Memorial Hospital; and the Scott, Sherwood,

and Brindley Foundation.[1]  Specifically, Payne contended that appellants were negligent in carrying out their medical responsibilities and that their negligence caused her pressure ulcers.  In addition to her original petition, Payne filed an expert report authored by Joe D. Haines Jr., M.D., M.P.H, which asserted, among other things, that the staff at HBMC deviated from the applicable standard of care, did not exercise reasonable care in treating Payne, and ultimately caused her pressure ulcers.

Appellants responded by filing an original answer denying each of the allegations contained in Payne's original petition and asserting numerous affirmative defenses.  Appellants also objected to Dr. Haines's initial expert report, arguing that he failed to adequately explain his qualifications to opine "on the standard of care or breach applicable to nurses or a hospital caring for a hospitalized patient in the ICU or on the floor who develops pressure ulcers" and that his statements regarding causation were "speculative and conclusory and fail to establish a link between Defendant's alleged breach and Plaintiff's alleged injury."

Payne responded to appellants' objections by filing two supplemental expert reports also authored by Dr. Haines, wherein he expounded on his qualifications and causation.  Appellants objected to Dr. Haines's supplemental expert reports on the same grounds as previously raised.[2]

---

[1] In her first amended petition, Payne dropped her claims against Scott and White Memorial Hospital and the Scott, Sherwood, and Brindley Foundation.  Therefore, only HBMC and HHSI remain as parties to this appeal.

[2] The record does not contain a written order indicating that the trial court ruled on appellants' objections.

Subsequently, on November 19, 2010, appellants filed a joint motion to dismiss Payne's health-care-liability claims, asserting that Payne had not timely filed a sufficient expert report in compliance with section 74.351 of the civil practice and remedies code. *See id.* § 74.351(a)-(b). The trial court conducted a hearing on appellants' joint motion to dismiss, and, on December 20, 2010, entered an order stating that Dr. Haines's expert reports were insufficient. However, the trial court granted Payne a thirty-day extension to cure the deficiencies in the reports. *See id.* § 74.351(c).

Thereafter, Payne filed an additional expert report from Dr. Haines dated January 15, 2011, and an expert report from Dora M. Carcoba, a registered nurse who opined on the standard of care and breach, as it related to nurses. Appellants once again objected to Dr. Haines's expert report as not sufficiently demonstrating his qualifications and asserting causation in a conclusory manner. Appellants also objected to Carcoba's qualifications to render an opinion in this matter because she is a nurse, not a physician. Furthermore, appellants reasserted their joint motion to dismiss. *See id.* § 74.351(a)-(b).

Finally, on April 19, 2011, the trial court, after a hearing, denied appellants' joint motion to dismiss and objections. This interlocutory appeal followed. *See id.* § 51.014(a)(9) (West 2008) (permitting the appeal of an interlocutory order from a district court that "denies all or part of the relief sought by a motion under Section 74.351(b)").

## II.    STANDARD OF REVIEW

We review a trial court's denial of a motion to dismiss under section 74.351 for an abuse of discretion. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am.*

*Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

### III.    APPLICABLE LAW

Section 74.351 of the civil practices and remedies code provides that within 120 days of filing a health-care-liability claim, a claimant must serve a curriculum vita and one or more expert reports regarding every defendant against whom a health-care claim is asserted. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *see also College Station Med. Ctr., LLC v. Todd*, No. 10-09-00398-CV, 2010 Tex. App. LEXIS 7290, at *3 (Tex. App.—Waco Sept. 1, 2010, pet. denied) (mem. op.). The expert report must contain

> a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *see Palacios*, 46 S.W.3d at 877. If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in [section 74.351(r)(6)]." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51-52 (Tex. 2002); *see Palacios*, 46 S.W.3d at 878.

To constitute a "good faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the

plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52-53 (noting that "magical words" are not necessary to provide a fair summary of the standard of care, breach of that standard, and causation); *see Palacios*, 46 S.W.3d at 879 ("A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements."). The trial court should look no further than the report itself, because all the information relevant to the inquiry should be contained within the document's four corners. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (citing *Palacios*, 46 S.W.3d at 878). An expert report, however, does not need to marshal all of the plaintiff's proof; it may be informal and the information presented need not meet the same requirements as evidence offered in summary judgment proceedings or in trial. *See Spitzer v. Berry*, 247 S.W.3d 747, 750 (Tex. App.—Tyler 2008, pet. denied); *see also Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.).

## IV. QUALIFICATIONS OF DR. HAINES

In their first issue, appellants contend that Payne's expert reports do not demonstrate that Dr. Haines "is qualified to address the existence of a causal connection between Appellee's development of a pressure ulcer and HBMC's alleged breach of the applicable standard of care." Specifically, appellants argue that Dr. Haines's statements about his experience treating pressure ulcers are conclusory and fail to show that "he is

qualified to determine the specific causes of a patient's pressure ulcer when faced with at least thirteen possible causes of that ulcer."

## A. Applicable Law

Section 74.351(r)(5)(C) provides that an "expert" in a health-care liability claim is:

> with respect to a person giving opinion testimony about the causal relationship between the injury, harm, or damages claimed and the alleged departure from the applicable standard of care in any health care liability claim, a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(C); *see id.* § 74.403(a) (West 2011) ("[A] person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence."). However, a professional need not be employed in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify him to give an opinion on that subject. *Broders v. Heise*, 924 S.W.2d 148, 153-54 (Tex. 1996); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402 (West 2011) (listing the requirements for an expert to be considered qualified in a suit against a health-care provider); *see also* TEX. R. EVID. 702 (allowing experts to testify based on their "knowledge, skill, experience, training, or education"). "[W]hen a party can show that a subject is substantially developed in more than one field, testimony can come from a qualified expert in any of those fields." *Broders*, 924 S.W.2d at 154.

Qualifications of an expert must appear in the expert reports and curriculum vitae and cannot be inferred. *See Salais v. Tex. Dep't of Aging & Disability Servs.*, 323 S.W.3d 527, 536 (Tex. App.—Waco 2010, pet. denied); *see also Estorque v. Schafer*, 302 S.W.3d 19, 26 (Tex. App.—Fort Worth 2009, no pet.) (citing *Olveda v. Sepulveda*, 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004, pet. denied)); *Baylor College of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Analysis of the expert's qualifications under section 74.351 is limited to the four corners of the expert reports and the expert's curriculum vitae. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (requiring a health-care-liability claimant to file both an expert report and the expert's curriculum vitae within 120 days of the filing of the original petition); *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex. 2008) (considering an expert's curriculum vitae and report in determining whether the expert was qualified to opine about plaintiff's negligent credentialing cause of action); *Leonard v. Glenn*, 293 S.W.3d 669, 676 (Tex. App.—San Antonio 2009), *rev'd on other grounds*, 332 S.W.3d 403 (Tex. 2011); *Polone v. Shearer*, 287 S.W.3d 229, 238 (Tex. App.—Fort Worth 2009, no pet.); *Pokluda*, 283 S.W.3d at 117; *Mosely v. Mundine*, 249 S.W.3d 775, 779 (Tex. App.—Dallas 2008, no pet.); *see also Lewis v. Funderburk*, No. 10-05-00197-CV, 2008 Tex. App. LEXIS 9761, at *6 (Tex. App.—Waco Dec. 31, 2008, pet. denied) (mem. op.).

Merely being a physician is insufficient to qualify as a medical expert. *See Broders*, 924 S.W.2d at 152; *see also Hagedorn v. Tisdale*, 73 S.W.3d 341, 350 (Tex. App.—Amarillo 2002, no pet.) ("Every licensed doctor is not automatically qualified to testify as an expert on every medical question."). But we defer to the trial court on close calls

concerning an expert's qualifications. *See Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006); *see also Broders*, 924 S.W.2d at 151 ("The qualification of a witness as an expert is within the trial court's discretion. We do not disturb the trial court's discretion absent clear abuse.").

## B. Discussion

At the outset of our analysis of this issue, we note that "[e]xpert reports can be considered together in determining whether the plaintiff in a health care liability action has provided adequate expert opinion regarding the standard of care, breach, and causation." *Salais*, 323 S.W.3d at 534; *see Walgreen Co. v. Hieger*, 243 S.W.3d 183, 186 n.2 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i). Therefore, we consider the language contained within the four corners of all of the expert reports that Payne proffered. In addition, we reject appellants' assertion that Dr. Haines cannot qualify as an expert because allegedly he was unable to rule out thirteen other potential causes for the pressure ulcers.[3] *See Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.) ("Nothing in section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed."); *see also Whisenant v. Arnett*, 339 S.W.3d 920, 926 (Tex. App.—Dallas 2011, no pet.).

---

[3] To some extent, this argument is misleading given that Dr. Haines mentioned in his initial expert report that: "Even though Ms. Payne suffers from end-stage renal disease, hypertension[,] and diabetes, she had never had problems with pressure ulcers and entered HBMC without pressure ulcers." In a subsequent expert report, Dr. Haines stated that: "Within a reasonable degree of medical probability, Ms. Payne's co-morbid conditions of diabetes, hypertension[,] and end-stage renal disease did not cause the pressure ulcer because those conditions cannot spontaneously cause such a condition."

Texas courts have stated the following regarding expert qualifications:

When a physician fails to state in his expert report or affidavit that he has knowledge of the standard of care applicable to the specific types of health care providers involved in the claim, or that he has ever worked with or supervised the specific types of health care providers involved in the claim, the physician is not qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. . . . However, if the physician states he is familiar with the standard of care for both nurses and physicians, and for the prevention and treatment of the illness, injury, or condition involved in the claim, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. . . . Further, if a physician states he is familiar with the standard of care and responsibilities and requirements for physician's assistants, and he has worked with, interacted with, and supervised physician's assistants, the physician is qualified on the issue of whether the health care provider departed from the accepted standards of care for health care providers. . . . A physician is not required to state he is familiar with the core standards contained in the code, establishing the 'core standards' for nurse practitioners or physician's assistants.

*Wallace*, 278 S.W.3d at 558 (citing *Cook v. Spears*, 275 S.W.3d 577, 582-84 (Tex. App.—Dallas 2009, no pet.); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 814 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Simonson v. Keppard*, 225 S.W.3d 868, 872-74 (Tex. App.—Dallas 2007, no pet.)).

In response to appellants' first objections to his qualifications, Dr. Haines filed an amended expert report, wherein he noted:

Regarding the objection made about my qualifications to render opinion about the nursing standard of care in this case: I have experience in caring for patients with pressure ulcers. I write nursing orders to the nurses caring for patients with pressure ulcers. I, therefore, have experience in supervising nurses with regard to the carrying out of my orders. I also know when a nurse has not followed my orders. I have cared for numerous hospitalized patients who have developed pressure ulcers. I have cared for numerous hospitalized patients who were at risk for developing pressure ulcers[,] and I have managed a hospitalized patient's

treatment of or the prevention of pressure ulcers. Throughout my entire medical career, I have supervised nurses in the care, treatment[,] and prevention of hospitalized patients who are at risk for or have pressure ulcers. The standard of care is the same for nurses and physicians in regard to the care, treatment[,] and/or prevention of pressure ulcers regardless of where the patient is, i.e. a hospital or a nursing home. The standard of care for the prevention of and treatment of pressure ulcers is the same for nurses as it is for physicians: the patient should be turned every two hours, the area at risk should be kept clean and dry, and the skin should be carefully monitored.

In his January 15, 2011 report, Dr. Haines stated the following with respect to additional objections made by appellants:

I have been the treating physician responsible for the care of patients in the ICU exactly like Ms. Lillie Payne who have multi-system organ failure, end-stage renal disease, febrile illness, MRSA sepsis, septic shock, respiratory failure, decreased circulation, diabetes, and hypertension who are on a ventilator, pressors, restraints and have restricted nutritional intake. The fact that Ms. Payne had multi-system organ failure, end-stage renal disease, febrile illness, MRSA sepsis, septic shock, respiratory failure, decreased circulation, diabetes, and hypertension and was on a ventilator, pressors, restraints[,] and had restricted nutritional intake within a reasonable degree of medical probability made her body even more at risk for the development of pressure ulcers. I am qualified to give opinions about causation in this matter as it relates to the development of a pressure ulcer in an ICU patient due to my experience in treating these patients, ordering nurses in the care and treatment of these patients to prevent pressure ulcers, and through my education in medical school, residency[,] and when I obtained my Masters Degree in Public Health.

Moreover, Dr. Haines's initial expert report and curriculum vitae demonstrate that he has been practicing medicine since 1981. Dr. Haines, an active duty naval physician, has numerous certifications, including board certification in family practice, and

extensive experience practicing medicine in urgent care, combat zones, and in hospital settings.[4]

Appellants assert that Dr. Haines was required to "show he has expertise on the 'very matter' or 'specific issue' before the court" and that qualifications "cannot be established through conclusory statements lacking sufficient facts and explanation." In particular, appellants contend that Dr. Haines, in his expert reports, should have indicated: (1) the number of patients he has treated with symptoms similar to Payne; (2) when he treated such patients; (3) whether he was able to prevent the development of pressure ulcers in these patients; and (4) how and why this experience qualifies him to determine the cause of Payne's pressure ulcers. Though appellants cite two cases that allegedly support their contention that Dr. Haines's expert reports were conclusory as to his qualifications, we do not find these cases to be on point. *See Leland v. Brandal*, 217 S.W.3d 60, 63 (Tex. App.—San Antonio 2006) (holding that an anesthesiologist, who cared for patients that were at risk for strokes and who were taking Plavix and aspirin, was not qualified "to state the effect of the cessation of Plavix and aspirin during the time period in question proximately caused Brandal's stroke"), *aff'd*, 257 S.W.3d 204 (Tex. 2008); *see also Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (addressing an expert's statements regarding causation and stating that "[a] conclusory report does not meet the Act's requirements, because it does not satisfy the *Palacios* test"). Furthermore,

---

[4] In fact, in his initial expert report, Dr. Haines reduced his curriculum vitae to paragraph form under the heading "I. Qualification." Therefore, both this Court and the trial court could determine Dr. Haines's qualifications by solely looking at the four corners of his expert reports, though consideration of his curriculum vitae was not prohibited.

appellants do not cite to any authority to support their argument that Dr. Haines's expert reports were required to be as precise as appellants desire.

Here, Dr. Haines specifically mentioned that he has experience treating patients like Payne who have been hospitalized and developed pressure ulcers. He also has experience directing nurses in the treatment of pressure ulcers and treating patients with some of the pre-existing medical conditions that Payne has. Based on the language contained in Dr. Haines's expert reports and curriculum vitae, we cannot say that the trial court clearly abused its discretion in concluding that Dr. Haines has the "knowledge, skill, experience, training, or education" regarding the standard of care for the treatment and/or prevention of pressure ulcers or, in other words, that he is qualified to give an opinion on the particular subject. *See Broders*, 924 S.W.2d at 153. Moreover, when a trial court concludes for purposes of chapter 74 that an physician is qualified to opine about the standard of care for a certain operation or procedure, it is also reasonable for the trial court to conclude that the physician is qualified to opine on the causal relationship between that operation or procedure and the complications that can arise from it. *See Whisenant*, 339 S.W.3d at 927 (citing *Livingston v. Montgomery*, 279 S.W.3d 868, 873 (Tex. App.—Dallas 2009, no pet.)). We therefore hold that the trial court did not clearly abuse its discretion in determining that Dr. Haines is qualified to opine as to the causation element. *See id.*; *see also Livingston*, 279 S.W.3d at 873. Accordingly, we overrule appellants' first issue.

## V. PAYNE'S EXPERT REPORTS AND CAUSATION

In their second issue, appellants assert that Payne's expert reports are insufficient with respect to causation because the statements contained therein are conclusory. In particular, appellants allege that Dr. Haines was required to: (1) rule out the other thirteen possible causes for the development of the pressure ulcers; and (2) sufficiently explain how the pressure ulcers would not have occurred but for HBMC's actions.

We recognize that a nurse cannot, as a matter of law, establish the causation prong required by section 74.351(r)(6). *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.351(r)(5)(c), 74.403(a); *Benish v. Grottie*, 281 S.W.3d 184, 205 (Tex. App.—Fort Worth 2009, pet. denied). A nurse may, however, give an opinion on the standard of care for nurses and a breach of that standard. *See Christus Spohn Health Sys. Corp. v. Sanchez*, 299 S.W.3d 868, 877-78 (Tex. App.—Corpus Christi 2009, pet. denied); *Benish*, 281 S.W.3d at 205-06. In addition, the trial court was authorized to consider Nurse Carcoba's report on standard of care and breach and Dr. Haines's report on causation. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *Sanchez*, 299 S.W.3d at 877-78 (considering together a nurse's report on the standard of care for nurses and a physician's report on causation).

In her report, Nurse Carcoba stated the following with regard to the applicable standard of care:

> The Standard of Care for Hillcrest Baptist Medical Center by and through the nurses named above was to:
>
> 1. Perform ongoing nursing assessments of the patient to identify actual and potential problem areas[;]

2. Make appropriate nursing diagnoses, i.e. [a]lteration in comfort, alteration in hydration, alteration in skin integrity, alteration in elimination pattern, potential for Urinary tract infection, etc. based on ongoing assessments[;]

3. Develop a comprehensive plan of care which sets forth identified (actual or potential) problem interventions designed to prevent adverse outcomes from known problem areas[;]

4. Implement Plan of Care[;]

5. Evaluate patient's response to implemented [P]lan of [C]are[; and]

6. Update Plan of [C]are consistent with the patient[']s response[.]

The Standard of Care for Prevention of Pressure Ulcers for Hillcrest Baptist Medical Center by and through the nurses named above was to:

1. Conduct a pressure ulcer admission assessment for all patients[,] including Ms. Payne (Braden Score Scale or Norton Score Scale)[;]

2. Reassess risk for all patients daily (Braden Score Scale or Norton Score Scale)[,] including Ms. Payne[;]

3. Inspect skin of at-risk patients daily[,] including Ms. Payne[;]

4. Manage moisture[;]

5. Optimize nutrition/hydration[;]

6. Every 2 to 4 hour 30 degree/lateral tilt[;]

7. Minimize pressure[; and]

8. Once a pressure ulcer develops, the wound should be properly documented and photographed in the medical record. Color, size, depth, drainage, odor[,] and progression and notify physician[.]

The Standard of Care for Hillcrest Baptist Medical Center by and through the nurses named above, with regards to Ms. Lillie Payne required that:

1. The patient be turned every 2 hours to prevent pressure damage to the skin[;]

2. That proper bedding (air mattress) be provided to prevent pressure ulcers[;]

3. Once a pressure ulcer develops, the wound should be properly documented and photographed in the medical record. Color, size, depth, drainage, odor[,] and progression and notify physician[;]

4. Upon discharge, wound care instructions should be provided to family and home healthcare nursing staff[; and]

5. Provision of a therapeutic mattress[.]

Nurse Carcoba then opined that HBMC, by and through their nurses, deviated from the standard of care by failing to: (1) "[p]erform ongoing nursing assessments of the patient to identify actual and potential problem areas"; (2) "[m]ake appropriate nursing diagnoses, i.e. [a]lteration in comfort, alteration in hydration, alteration in skin integrity, alteration in elimination pattern, potential for Urinary tract infection, etc. based on ongoing assessments"; (3) "[d]evelop a comprehensive plan of care which sets forth identified (actual or potential) problem interventions designed to prevent adverse outcomes from known problem areas"; (4) "[i]mplement Plan of Care"; (5) "[e]valuate patient's response to implemented [P]lan of [C]are"; (6) "[u]pdate Plan of [C]are consistent with patient[']s response; (7) "[c]onduct a pressure ulcer admission assessment for Ms. Payne (Braden Score Scale or Norton Score Scale)"; (8) "[r]eassess risk for Ms. Payne daily (Braden Score Scale or Norton Score Scale)"; (9) "[i]nspect skin or at-risk patients daily[,] which includes Ms. Payne"; (10) "[m]anage moisture"; (11) "[o]ptimize nutrition/hydration"; (12) "[e]very 2 to 4 hour 30 degree/lateral tilt; (13) "[m]inimize pressure"; and (14) "[o]nce a pressure ulcer develops, the wound should be properly documented and photographed in the medical record. Color, size, depth, drainage, odor[,] and progression and notify physician." In particular, Nurse Carcoba stated that HBMC breached the standard of care applicable to Payne by failing to: (1) turn her every two hours to prevent pressure damage to the skin; (2) provide proper bedding (i.e., an air mattress) to prevent the formation of pressure ulcers; (3) properly document and photograph the pressure ulcers in the medical record; (4) notify a

physician immediately when the pressure ulcers developed; (5) provide wound care instructions to family and home healthcare nursing staff; and (6) provide a therapeutic mattress.[5]

In his report, Dr. Haines, relying on Nurse Carcoba's statements, provided the following with respect to causation:

> It is my opinion, that the deviations from the standard of care stated by Nurse Carcoba in her report, within a reasonable degree of medical probability, proximately caused the pressure ulcer suffered by Ms. Payne. The pathophysiologic reason why Ms. Payne developed this pressure ulcer was because when she was allowed by the nursing staff to remain in the same position for greater than two hours without being turned, was not laterally tilted at 30 degrees every 2 to 4 hours[,] and did not have proper bedding and a therapeutic mattress. This proximately caused the circulation to be diminished to the area of her sacrum and coccyx and put pressure on the sacrococcygeal area. This diminished circulation to this area proximately caused the tissue to be damaged due to the lack of blood flow to [the] sacrococcygeal area. The lack of blood flow to the sacrococcygeal area proximately caused the tissue to die causing the pressure ulcer that Ms. Payne had.
>
> If the nurses had documented and discussed Ms. Payne's pressure ulcer in the chart using the parameters of size, color, depth, drainage, odor[,] and progression, the worsening of the ulcer would have been tracked in the record and become apparent to the physicians who then would have been alerted. The physicians would then have implemented a treatment plan, including off loading, wound care[,] and a specialty mattress. Within a reasonable degree of medical probability, these interventions would have prevented the pressure ulcer from progressing to a Stage IV ulcer. Further, when the nurses failed to inform a physician immediately of the formation of the pressure ulcer, this proximately caused the wound to go unnoticed and untreated. Had the nurses informed the physician of the ulcer, the ulcer would not have progressed to a Stage IV ulcer . . . . Within a reasonable degree of medical probability, these interventions would have prevented the pressure ulcer from progressing to a Stage IV ulcer.

---

[5] Appellants do not make any complaint as to Nurse Carcoba's report.

Within a reasonable degree of medical probability, Ms. Payne's comorbid conditions listed above did not cause the pressure ulcer because those conditions cannot spontaneously cause such a condition. Rather, these comorbid conditions made it even more incumbent upon the nursing staff to diligently turn and tilt Ms. Payne to prevent a pressure ulcer from occurring. It is my opinion that within a reasonable degree of medical probability, the pressure ulcer Ms. Payne suffered would not have occurred but for the deviations from the standard of care listed in Nurse Carcoba's report for the reasons stated above. This pressure ulcer, within a reasonable degree of medical probability, was an absolutely preventable injury had the nurses listed in Nurse Carcoba's report followed the standard of care as stated in her report and in this report. It is also my opinion that had the nurses properly informed the physicians of the formation of this pressure ulcer when it was only a Stage I ulcer, it would have been properly treated and would not have progressed to a Stage IV ulcer.

Based on our reading of Payne's expert reports, we cannot say that the trial court clearly abused its discretion in concluding that the reports adequately addressed the requisite elements for Payne's health-care-liability claims such that they: (1) informed appellants of the specific conduct called into question; and (2) provided a basis for the trial court to determine that Payne's claims have merit. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Palacios*, 46 S.W.3d at 879. Moreover, we reject appellants' assertion that Payne's expert reports are insufficient and conclusory because the reports allegedly did not rule out all of the thirteen other reasons for developing a pressure ulcer. This holding is based on the following: (1) Texas courts have held that an expert report need not rule out all other potential causes for the injury sustained in a health-care setting, *see Wallace*, 278 S.W.3d at 562; *Arnett*, 339 S.W.3d at 926; (2) an expert report need not marshal all of the plaintiff's proof or meet the evidentiary standards applicable to summary judgment proceedings or trial, *see Bakhtari*, 317 S.W.3d at 496; *Spitzer*, 247

S.W.3d at 750; and (3) Dr. Haines opined that, based on a reasonable degree of medical probability, the other conditions did not contribute to the development of Payne's pressure ulcers. And because we have concluded that the trial court did not abuse its discretion in concluding that Payne's expert reports were sufficient, we cannot say that the trial court abused its discretion in denying appellants' joint motion to dismiss on these grounds. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Palacios*, 46 S.W.3d at 875. Accordingly, we overrule appellants' second issue.

## VI. WHETHER PAYNE'S EXPERT REPORTS ADEQUATELY ADDRESSED HHSI

In their third issue, appellants argue that Payne failed to timely file an expert report mentioning HHSI, much less addressing HHSI's role in this matter. According to appellants, "Appellee's failure to provide the trial court with an expert report regarding her claims against HHSI left the trial court with no discretion other than dismissal of those claims." Payne responds that her expert reports implicate HBMC and HHSI because they expressly list all the names of the nurses involved in her treatment and those nurses are agents, employees, or representatives of HBMC and/or HHSI.

The parties do not dispute that Payne asserted health-care-liability claims against both HBMC and HHSI. The parties also do not dispute that neither Dr. Haines nor Nurse Carcoba specifically referenced HHSI in their expert reports. Instead, Nurse Carcoba listed the actions of several nurses whose alleged treatment, or lack thereof, of Payne was negligent. The Texas Supreme Court has specifically held that "[w]hen a party's alleged health care liability is purely vicarious, a report that adequately

implicates the actions of that party's agents or employees is sufficient." *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671-72 (Tex. 2008) (citing *Univ. of Tex. Med. Branch v. Railsback*, 259 S.W.3d 860, 864 (Tex. App.—Houston [1st Dist.] 2008, no pet.); *Univ. of Tex. Sw. Med. Ctr. v. Dale*, 188 S.W.3d 877, 879 (Tex. App.—Dallas 2006, no pet.); *Casados v. Harris Methodist H-E-B*, No. 2-05-080-CV, 2006 Tex. App. LEXIS 6357, at **12-13 (Tex. App.—Fort Worth July 20, 2006, no pet.) (not designated for publication)).

However, in her report, Nurse Carcoba does not attribute the actions of the nurses to HHSI or implicate HHSI in any way. Like Dr. Haines, Nurse Carcoba does mention HBMC in her report; however, we are left to speculate about HHSI's role in this matter. *See Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 244 (Tex. App.—Corpus Christi 2004, no pet.) ("An expert report may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant specifically breached the standard and how that breach caused or contributed to the cause of injury. Collective assertions of negligence against various defendants are inadequate.") (citing *Eichelberger v. St. Paul Med. Ctr.*, 99 S.W.3d 636, 638 (Tex. App.—Dallas 2003, pet. denied); *Doades v. Syed*, 94 S.W.3d 664, 671-72 (Tex. App.—San Antonio 2002, no pet.); *Rittmer v. Garza*, 65 S.W.3d 718, 722-23 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Whitworth v. Blumenthal*, 59 S.W.3d 393, 396 (Tex. App.—Dallas 2001, no pet.) ("[T]he report . . . does not identify any particular defendant to which it applies and instead generally asserts 'the health care providers' failed to meet the standard of medical care."); *Wood v. Tice*, 988 S.W.2d 829, 831 (Tex.

App.—San Antonio 1999, pet. denied) ("The report must specifically refer to the defendant and discuss how that defendant breached the applicable standard of care.").

Nonetheless, Payne cites to this Court's decision in *Hillcrest Baptist Medical Center v. Wade* to support her contention that "[e]ven if this Court believes the relationship of Appellants is not entirely clear from the record, this Court has assumed in medical malpractice cases that vicarious liability claims are being asserted when nurses' actions are being criticized." *See* 172 S.W.3d 55, 57 (Tex. App.—Waco 2005, pet. granted, appeal dism'd). Based on our reading, we do not find the *Wade* case to be persuasive in this matter.

The facts stated in the *Wade* majority opinion do not appear to correspond with those involved here—a plaintiff suing what appears to be two separate health-care facilities and/or entities. *Id.* at 56. The *Wade* majority opinion merely stated that "Wade sued Hillcrest Baptist Medical Center, two emergency room doctors, and their employers . . . ." *Id.* However, the majority opinion does not clarify who were the employers of the emergency room doctors and the relationship the emergency room doctors had with Hillcrest. Rather, the majority opinion states that "[t]he relationship of the defendants in the underlying medical malpractice case is not entirely clear from the record." *Id.* at 57. Nevertheless, the majority in *Wade* presumed that Hillcrest's liability "would be based on, at a minimum, any negligence by its nursing staff, which will be the subject of our inquiry." *Id.*

To the extent that the *Wade* court looked outside the four corners of the expert report or presumed facts in the determination of whether the report properly

implicated Hillcrest, we disapprove of that practice. *See id.* at 61 (Gray, C.J., dissenting) ("Though addressing the alleged breaches by Hillcrest's codefendant's, the two reports by physicians do not address Hillcrest's conduct, and in particular any causal relationship between Hillcrest's conduct and the injury to Wade. . . . The trial court abused its discretion in overruling Hillcrest's motion."); *see also Bowie Mem'l Hosp.*, 79 S.W.3d at 52 (noting that the trial court should look no further than the report itself, because all the information relevant to the inquiry should be contained within the document's four corners); *Palacios*, 46 S.W.3d at 878 (same). Texas case law clearly states that the expert reports tendered by a health-care-liability claimant must clearly explain and address the elements as to each named defendant in a health-care-liability action. *See Taylor*, 169 S.W.3d at 244; *Eichelberger*, 99 S.W.3d at 638; *Doades*, 94 S.W.3d at 671-72; *Rittmer*, 65 S.W.3d at 722-23; *Whitworth*, 59 S.W.3d at 396; *Wood*, 988 S.W.2d at 831. Therefore, because the *Wade* majority opinion is not clear about the relationship between Hillcrest, the emergency room doctors, and their purported employers, and because the majority appeared to go outside of the expert report to implicate Hillcrest, a practice that is not supported by case law, we do not find the *Wade* case to be persuasive in this matter.

Looking no further than the four corners of the expert reports tendered, we cannot say that the expert reports of Dr. Haines and Nurse Carcoba informed HHSI of the specific conduct Payne called into question and provided a basis for the trial court to conclude that Payne's claims against HHSI have merit. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Palacios*, 46 S.W.3d at 879. To date, we are not clear as to why

HHSI is involved in this case. As such, we conclude that the expert reports tendered by Payne do not constitute a good-faith effort with regard to HHSI. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Palacios*, 46 S.W.3d at 879. Accordingly, we hold that the trial court abused its discretion in denying the motion to dismiss as to HHSI. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *see also Palacios*, 46 S.W.3d at 879. Appellants' third issue is sustained.

## VII. CONCLUSION

Based on the foregoing, we affirm the trial court's judgment as it pertains to HBMC. However, we reverse the trial court's denial of appellants' motion to dismiss as it pertains to HHSI. As such, we render judgment dismissing Payne's claims against HHSI with prejudice and remand for the determination of reasonable attorney's fees and costs owed to HHSI. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

AL SCOGGINS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
     (Justice Davis concurring with a note)*
Affirmed, in part, and reversed and remanded, in part
Opinion delivered and filed November 16, 2011
[CV06]

*(Justice Davis concurs in the Court's judgment only. A separate opinion will not issue.)